UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JENNIFER LOUISE LOPEZ,     : ECF Case
              :
      Plaintiff,   :
              : Case No.: 15-cv-7020
   -against-     :
              :
THE CITY OF NEW YORK, NYPD OFFICERS :
DOE1-20, CECIL HOUSING DEVELOPMENT : **COMPLAINT**
FUND CORPORATION, HOUSING AND  :
SERVICES, INC., and RALPH GARCIA,  :
              : **PLAINTIFF DEMANDS**
      Defendants.  : **TRIAL BY JURY**
              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

   Plaintiff, Jennifer Louise Lopez ("Plaintiff"), alleges as her Complaint the following:

   1.  Plaintiff is a woman of trans experience.  Her journey typifies that of other people who, like Plaintiff, courageously decided to take responsibility for their life with their actions and to live openly according to the dictates of their conscience.  For Plaintiff, that means to be and live as a woman.  After Plaintiff came out in the fall of 2012, Plaintiff's family severed their ties with her.  Within a few months she was homeless, as are one in five persons of trans experience at some point in their lives, and sleeping on New York City subway cars.

   2.  Finally, in April 2013, Plaintiff moved into a room at the Cecil Hotel, a publicly-funded, SRO housing project that comprises twenty-four rooms, two communal kitchens and ten shared bathrooms per floor.  Cecil Hotel purports to provide safe, permanent housing for at risk persons such as Plaintiff and to provide a panoply of social services to support tenants.

   3.  Within three months of moving into the Cecil Hotel, five of Plaintiff's neighbors (her "Tormentors") had mounted a full-time campaign of harassment, intimidation and other criminal and vulgar behavior directed at Plaintiff solely because of her honest expressions of her gender identity.  Tormentors' behavior includes daily epithets, intentional disruption of Plaintiff's sleep, threats of physical violence, and physical intimidation such as being punched.

4.      For more than two years, Owner has refused to intervene on Plaintiff's behalf or even to enforce either their own house rules that protect Plaintiff from such abuse.  To the contrary, their security officers taunt Plaintiff and threaten her with retribution for complaining.

5.      Plaintiff has called for the NYPD's help dozens of times.  Each time, the NYPD's responding officers treat Plaintiff with disdain or even contempt, refuse to render any assistance to Plaintiff, and refuse to file a criminal complaint from her.  When Plaintiff twice appealed to the NYPD 28th Precinct's command structure, she was promised that she would be afforded equal protection.  Instead, the NYPD did nothing.  The Owner's chief of security, a retired NYPD lieutenant, later said he "made a few calls" to his friends at the NYPD.

6.      Last week, while suffering another hateful diatribe, Plaintiff struck one of her Tormentors in the face.  Another Tormentor then battered Plaintiff.  The NYPD arrested only Plaintiff.  With irony both supreme and vile, Owner then communicated to Plaintiff that the house rules require tenants to refrain from disturbing their neighbors and that Plaintiff would have to meet with management to discuss whether her tenancy can continue.   Yesterday morning, Owner cancelled Plaintiff's psychiatric session, scheduled for yesterday, and told Plaintiff Owner no longer feels comfortable offering her psychiatric services.  Plaintiff requested those services because two weeks ago she was so fixated on suicide she feared for her safety.

7.      Plaintiff has adopted a nocturnal schedule to avoid her Tormentors.  She has begun to drink to sleep.  The constant sleeplessness, depression, isolation, and anxiety that comes with having no safe place to go and no one to call for help have worn Plaintiff down physically and mentally. She contemplates suicide.

8.      Accordingly, Plaintiff seeks injunctive relief as well as compensatory and punitive damages -- pursuant to 42 U.S.C. § 1983 -- against the City of New York and the

Officer Defendants (collectively, the "Municipal Defendants"),[1] and seeks injunctive relief and damages -- pursuant to 42 U.S.C. § 1983, the New York Civil Rights Law, New York State Human Rights Law, and New York City Human Rights Law -- against the remaining defendants.

## THE PARTIES

9.     Plaintiff Jennifer Louise Lopez is a natural person who resides and is domiciled in the State, County and City of New York.  Plaintiff is a community activist who advocates for acceptance and integration of persons of trans experience.

10.     Defendant The City of New York ("City") is a municipal corporation duly organized and existing under the laws of the State of New York.  The City can be served with process care of Corporation Counsel, 100 Church Street, New York, New York.

11.     As set forth below in greater detail, the acts and omissions complained of were perpetrated by the NYPD, the agency of the City of New York responsible for law enforcement, and several of the NYPD's officers acting further to and consistent with the official custom or policy of the City.  Pursuant to the New York City Charter, however, all actions or proceedings for the violation of any law must be brought in the name of the City of New York, not its agencies.  The NYPD therefore is not a party to this action.

12.     Defendants NYPD Officers Doe1-20 (collectively, the "Officer Defendants"), being fictitious names, are each employed by the City as an NYPD officer.  The full names, ranks and true identities of Officers Doe1-20 are unknown to Plaintiff without discovery but are persons who are liable to Plaintiff either for violating her constitutional rights by failing to accept

---

[1] Plaintiff has not yet complied with the notice and waiting period requirements imposed by New York General Municipal Law § 50 upon Plaintiff's state-law claims against the Municipal Defendants.  Plaintiff reserves the right to amend this Complaint to include those claims upon the expiration of the subject waiting period.

from her a criminal complaint or by failing to intervene when a subordinate officer did so with their knowledge.

13.     The domiciles of Officer Defendants are unknown to Plaintiff without discovery. However, upon information and belief, all Officer Defendants are domiciled in the State of New York, as required by the New York State Public Officers Law, in either the City of New York or a surrounding county.

14.     Defendant Cecil Housing Development Corporation, Inc. ("Cecil HDFC") is a not-for-profit corporation duly organized and existing under the laws of the State of New York and having its principal place of business c/o defendant Housing & Services, Inc., Attn.: James Dill, 461 Park Avenue South, 6th Floor, New York, New York, 10016.  In addition, as a Housing Development Fund Corporation, Cecil HDFC is a limited equity housing cooperative incorporated under Article XI of the New York State Private Housing Finance Law (PHFL) and the Business Corporation Law (BCL).  Cecil HDFC is the nominal landlord party to Plaintiff's lease and the fee owner of the real property located at 206 West 118th Street, New York, New York 10026 (the "Cecil Hotel"), the SRO building where Plaintiff lives.

15.     Defendant Housing and Services, Inc. ("Housing Inc.") is a not-for-profit corporation duly organized and existing under the laws of the State of New York and having its principal place of business at 202 East 135th Street, New York, New York  10016.  Defendant Housing Inc.'s mission includes ending chronic homelessness, preventing displacement for those at risk, and improving housing conditions for the marginalized through the development and management of permanent supportive housing projects, including the Cecil Hotel.

16.     The Cecil Hotel is operated by defendants Cecil Housing Development Corporation and Housing and Services, Inc. (collectively, "Owner") in conjunction with non-

party New York City Housing Preservation and Development ("HPD").  The Cecil Hotel is funded by public money from non-parties the United States Department of Housing and Urban Development ("HUD") and HPD, the latter of which is a party to Plaintiff's lease and regulates the operation of buildings under its auspices, including the Cecil Hotel.

17.     Defendant Housing Inc. provides all management services at the Cecil Hotel and is believed to be the parent company or affiliate of Cecil HDFC.  Cecil HDFC and Housing Inc. are alter egos of each other for all purposes relevant to this complaint.

18.     Defendant Ralph Garcia is a natural person employed by Owner as the chief of security whose duties include the safety and security of the Cecil Hotel.  Upon Information and belief, he formerly was employed by the City as an NYPD Lieutenant, a position from which he retired.  Defendant Ralph Garcia's domicile is unknown to Plaintiff without discovery.

## JURISDICTION AND VENUE

19.     This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiff's claims against the City and Officer Defendants (collectively, the "Municipal Defendants") arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States.

20.     This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiff's claims against Owner and Ralph Garcia (collectively, the "Private Party Defendants") arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States.

21.     This Court has supplemental subject matter jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's claims against the Private Party Defendants arising under the Constitution and laws of the State of New York and City of New York, because those state-law

claims are so related to Plaintiff's original-jurisdiction federal claims that they form part of the same case or controversy under Article III of the Constitution of the United States.

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) in that all Defendants reside in the State of New York and at least one defendant is located in this district, and because the events giving rise to Plaintiff's claims occurred in this district.

## FACTS COMMON TO ALL CLAIMS

A.     **Background and context regarding gender.**

23.     This case concerns the constitutional and legal protections afforded to people who are selected for discrimination because of their free expression of their gender identity.

24.     A person's "sex" refers to immutable biological characteristics of the human being as male or female, independent of social or political context. A person's "gender," on the other hand, has only a tenuous connection to biology and is almost entirely a social construct of what it means to be or act like a "masculine" or "feminine" person. Considering the totality of the differences between the social expectations for men and women in child rearing, family, worship, art, sex, education, politics and every other area of human endeavor, the differences between "masculine" and "feminine" have little to do with the purely biological difference between a male and a female. Like all social constructs, the concept of gender varies widely between cultural contexts and over time.

25.     According to the New York City Commission on Human Rights, *Guidelines Regarding Gender Identity Discrimination: A Form of Gender Discrimination Prohibited by The New York City Human Rights Law*, 2014, Gender identity is an individual's sense of being either male or female, man or woman, or something other or in-between. Gender expression describes

the external characteristics and behaviors that are socially defined as either masculine or feminine, such as dress, mannerisms, speech patterns and social interactions.

26.     We all have a gender identity and numerous means of gender expression.  A person who finds themselves in a cultural context where their personal gender identity and means of gender expression comport with the social expectations of how a biologically male or female person should behave are referred to as cis-gendered.  Trans-gender refers to a person whose personal gender identity and means of gender expression does not match society's expectations.

27.     Unfortunately, there is a long history of persecution and violence against persons of trans experience and, in particular, people of trans experience who are also people of color. The numbers are staggering.

28.     According to the National Coalition of Anti-Violence Programs, 72% of anti-LGBTQ homicide victims are women of trans experience and 67% are trans women of color. According to that same source, persons of trans experience are 300% more likely to be the victims of police violence, and trans persons of color are twice as likely to be victimized by police violence than their white counterparts.

29.     Fortunately, progress has been made in recent years towards recognizing and protecting the civil rights of persons of trans experience.  The City, for example, in 2002 amended the Title 8 of the Administrative Code of the City of New York (the "City HRL") to protect individuals from discrimination based on their gender and gender identity, including the finding that, "bias-related violence or harassment and disorder occasioned thereby threaten the rights and proper privileges of its inhabitants and menace the institutions and foundation of a free democratic state."  City HRL Law § 8-101.

30.     The New York State Assembly, in enacting the analogous New York Executive Law § 290 *et seq.* (the "New York State Human Rights Law"), also found and declared that bias crimes, including those motivated by expressions of gender identity, "menaces the institutions and foundation of a free democratic state and threatens the peace, order, health, safety and general welfare of the state and its inhabitants." New York State Human Rights Law § 290.

31.     Further, New York Penal Law specifically provide, in relevant part, that:

> The intolerable truth is that in these crimes, commonly and justly referred to as "hate crimes", victims are intentionally selected, in whole or in part, because of their race, color, national origin, ancestry, gender, religion, religious practice, age, disability or sexual orientation. **Hate crimes** do more than threaten the safety and welfare of all citizens. They **inflict on victims incalculable physical and emotional damage and tear at the very fabric of free society.** Crimes motivated by invidious hatred toward particular groups not only harm individual victims but send a powerful message of intolerance and discrimination to all members of the group to which the victim belongs. **Hate crimes can and do intimidate and disrupt entire communities and vitiate the civility that is essential to healthy democratic processes**. . .

N.Y. Penal Law § 485.00 ("Hate Crime Law") (emphasis added).

32.     More recently, in February 2015, HUD announced new guidelines to ensure equal access for persons of trans experience in homeless shelters and transitional housing, calling for access to shelter and programs to be based on a person's self-identified gender.  Those guidelines are similar to ones promulgated in 2014 by the U.S. Department of Justice for domestic violence shelters and other programs funded by the Violence Against Women Act (VAWA).

33.     In June 2015, the Supreme Court of the United States decided Obergefell v. Hodges, holding for the first time that a person's fundamental rights under the Fourteenth Amendment include the right to marry a person of either gender.

34.     Despite these changes in the law, persons of trans experience continue to face legal, social and political obstacles to the free expression of their true identities, not to mention threats to their very lives and well being.  Sadly, that plight is illustrated by the facts of this case.

**B.     Plaintiff overcame homelessness and found housing at Owner's Cecil Hotel.**

35.     Like far too many persons of trans experience, Plaintiff was rejected by her family after coming out and found herself homeless in New York City.

36.     In March 2013, Plaintiff was offered a subsidized room in the Cecil Hotel, Owner's SRO building offering subsidized housing through the auspices of HPD.

37.     According to the website of Owner, Housing Inc., its mission is to "end chronic homelessness, prevent displacement for those at risk and improve housing conditions for the marginalized through the development and management of permanent supportive housing . . ."[2]

38.     Specifically, Owner claims that,

> HSI [Housing Inc.] builds communities that help tenants achieve their fullest potential for housing self-sufficiency by assessing their individual needs and building respectful and caring environments to overcome barriers to their success. Our programs employ a housing first, harm reduction approach that is person-centered and outcome-oriented. Our primary goal is to keep residents housed, reduce crises, and help those most vulnerable re-integrate into social networks that they have long been excluded from; decreasing isolation, and promoting improved quality-of-life.

39.     Consistent with its mission and strategic plan, Owner adopted and promulgated House Rules that include, in relevant part:

> **TENANT CONDUCT**:  Tenants must not engage in conduct that interferes with the rights of other tenants to enjoy their apartments properly and peacefully or cause conditions that are dangerous, disruptive, hazardous, threatening, unsanitary or otherwise harmful to other residents, agency employees, and guests.  Verbal threats or abusive behavior are not allowed under any circumstances.

---

[2] See http://www.hsi-ny.org/#!our-mission/c1yxr, last visited September 2, 2015.

> <u>Weapons, fights or violence of any kind will not be tolerated as the</u> <u>safety and security of the entire community is our overriding</u> <u>priority</u>.
>
> **NOISE**:  In consideration of other tenants, activities that result in loud noise (e.g., radios, computers, and televisions set at higher volumes) that could impair the sleep of other individuals are not allowed before 9:00 a.m. or after 10:00 p.m. However, please be considerate of your neighbors **at all times** - keeping entertainment, conversations, and other activities at a reasonable volume throughout the day.  (bold and underline in original).

40.     Plaintiff had applied for subsidized housing at the Cecil Hotel because she was determined to obtain a safe, supportive home environment specifically accepting of persons of trans experience.  Before committing to her lease, Plaintiff specifically discussed with Kristi, Owner's managerial agent, Plaintiff's concerns about her safety and well being, not just her physical safety but her emotional and psychological well being, too.  Owner assured Plaintiff that the Cecil Hotel would be a safe, supportive environment where she could freely express her gender identity as a person of trans experience.  Based upon their assurances and all of the lovely promises contained in Owner's literature and on their website, Plaintiff signed the lease and moved into the Cecil Hotel on April 1, 2013.

**C.     Owner and the NYPD repeatedly refused to allow Plaintiff access to the police protection otherwise available in the community, thereby ratifying and encouraging her Tormentors' violence.**

41.     Within a few weeks the whispers started.  "Is that a man?"  The whispers grew louder and became statements.  "That's a man!"  "Look at that man!"

42.     When Plaintiff complained to Owner, she was criticized or threatened for complaining and told essentially to just get along.

43.     When her Tormentors saw that Plaintiff's complaints and requests for help to the Owner were deflected or resulted in Owner's retribution or ridicule towards Plaintiff, Tormentors escalated the frequency and intensity of their abuse.

44.     When Plaintiff called for police assistance, Owner and its security officers interfered with Plaintiff's attempts to exercise her right as a crime victim to file a criminal complaint with the NYPD, falsely represented that Plaintiff's dispute was part of a special "program" that would be addressed as part of the "program" by the "program coordinator," falsely implying that the Cecil Hotel's tenants were under some legal impairment.

45.     Owner and its security officers denigrated Plaintiff and her credibility to the NYPD, for example by describing her as always complaining or dishonest.

46.     Owner's employee, Security Officer Garcia, frequently referred to Plaintiff dismissively as "Jennifer Lopez" or "J Lo" to the NYPD's various responding officers, almost always eliciting a smile or chuckle from the officers.

47.     When her Tormentors saw that Plaintiff's complaints and requests for help to the NYPD went unanswered or resulted in the NYPD's dismissing or even ridiculing Plaintiff, Tormentors escalated the frequency and intensity of their abuse still further.

48.     Within three months of moving into the Cecil Hotel, and ever since then, Plaintiff has endured near-constant abuse that disturbs her sense of well being and compromises her physical and mental health.  Her Tormentors go out of their way to hurl the words "man" and "he" and "bastard" at Plaintiff as if it were Plaintiff's name.  Plaintiff endures being awoken to her Tormentors shouting vulgar epithets that cannot be repeated in this forum, many aimed in one way or another at Plaintiff's expression of her gender identity. Her Tormentors intentionally disturb Plaintiff's sleep and threaten her safety and security in some form or another.

49.     For example, Plaintiff has adopted a largely nocturnal lifestyle to minimize contact with her neighbors.  One favorite tactic of her Tormentors is to scream and play loud music purposefully to wake Plaintiff up, then turn it down when security arrives, then back up, and on and on.  As the Tormentor residing in apartment 3K once screamed at Plaintiff, after the police had left once again without taking a complaint from Plaintiff, "If you think this is that loud wait till I get this next [radio] box, you ain't never going to sleep."

50.     Another running "joke" amongst the Tormentors is to accuse Plaintiff of fouling the shared bathrooms in loud, obscene language designed to derogate Plaintiff for her gender expression, with explicit references to her genitalia and appearance.

51.     Often Plaintiff is threatened with violence.

52.     Plaintiff is the only person of trans experience who lives on her floor of the Cecil Hotel.

53.     Plaintiff's Tormentors do not abuse or torment any other person in the Cecil Hotel.

54.     Plaintiff's Tormentors have selected Plaintiff for abuse, in whole or substantial part, because of Plaintiff's honest expression of her gender identity.

55.     Owners and their security officers, including defendant Ralph Garcia and Security Officer Garcia, do not abuse or mistreat any other resident of the Cecil Hotel in the manner that they mistreat Plaintiff.

56.     Owners and their security officers, including defendant Ralph Garcia and Security Officer Garcia, have selected Plaintiff for abuse, in whole or substantial part, because of Plaintiff's honest expression of her gender identity.

57.     The specific acts of abuse are too numerous to recount in detail but all follow the same pattern.   First, the Tormentors' abuse continues unabated until it escalates beyond harassment to threats of physical or sexual violence, compelling Plaintiff to call 911.  When the NYPD responds, Owner's security officers tell the NYPD's officers that the "program director" will take care of Plaintiff's issue the next day, or that Plaintiff's complaints about her Tormentors are "all part of the program," or other words intended falsely to communicate to the NYPD that the Cecil Hotel is a "program" for the mentally ill, addiction rehabilitation or the like.

58.     It is noteworthy that the promotional literature of Owner, Housing Inc., specifically provides under the heading "how it works" the following statement:[3]

> We employ a housing first, harm reduction approach that is person-centered and outcome-oriented, enabling homeless individuals to address the complex barriers to their health and housing stability by:
>
> delivering safe, clean, permanent homes <u>without conditions</u> - <u>our tenants are not required to meet **any** prerequisites</u> before moving into HSI housing including attaining sobriety, going through rehabilitation programs, or receiving mental health treatment.
>
> providing access to wide-ranging on-site <u>services that are elective</u> and customized -  targeting the root causes of homelessness that resulted in displacement originally including poor health, untreated mental illness, chemical dependency and lack of educational and vocational opportunities. HSI programming is comprehensive, tailored to each individual's needs.

59.     Upon hearing the word "program," the NYPD's officers invariably abdicate their police powers to Owner, telling Plaintiff that her complaints against her Tormentors must be addressed to Owner and that Plaintiff cannot file any complaint with the NYPD.

60.     For example, in or about July 2013, the Tormentor residing in apartment 3P propositioned Plaintiff for sex.  On a prior occasion, he had threatened to kill Plaintiff.  On each

---

[3] <u>See</u> http://www.hsi-ny.org/#!the-hsi-model-/c2085, last visited September 2, 2015.

occasion, the NYPD responded, Security Officer Garcia, Owner's security guard, told the responding officers that the issue would be addressed with the "Program Coordinator" the next day.  The NYPD officers then told Plaintiff that all complaints must be addressed to Owner. Plaintiff told the responding officers, "he said he would kill me," to which one officer responded, "that's not a crime."

61.   As a further example, on April 19, 2015, the Tormentor who resides in apartment 3R began to yell through Plaintiff's door, "I am going be very sorry that I did not kill him [Plaintiff], I am tired of this shit.  I want to go to jail today for the first time, you come out that room, come out that room, I am not playing neither come on out of that room, they going to take my ass to jail today."  When the NYPD responded to Plaintiff's call for help, Security Officer Garcia once again told the NYPD officers that the "program" would take care of the issue and the responding officers turned on a dime and left, refusing to take any complaint from Plaintiff.

62.   Plaintiff wrote to Owner numerous times, including in connection with the incident on April 19, 2015, when Plaintiff wrote,

> S/O Garcia told a female police officer "This will all be dealt with when the program supervisor comes in on Monday."  Making it sound like the police did not need to do anything.  Also telling the police that this is "a program."  Which is a tactic used get NYPD not to do anything. . .
>
> S/O Garcia continuously inserts herself into the middle of situations when the police are called.  I have previously made written complaints about S/O Garcia many times.  These reports have not been responded to and S/O Garcia continues to be a major problem.  She purposefully attempts to get the police not to take any action when I am having problems with my neighbors that require police action to be taken.

63.     Plaintiff had previously complained to Owner about Owner's security officers' interference with her ability to exercise her right lawfully to complain to the police when she is the victim of a crime.  For example, on February 19, 2015, Plaintiff wrote to Owner:

> I am writing you this letter in regards to Security Officer Garcia's inappropriate behavior.  There have been continued problems with SO Garcia and I have submitted grievances about her in the past.  The following complaints are still continuing:
>
> 1.      Interfering with my communications with the police when I have to call them.  Today while the police where here, SO Garcia once again interfered as a referee attempting to side with the police.  Then further refereed to me as Ms. Jennifer Lopez, causing the police to laugh and not take me seriously.
>
> 2.      SO Garcia continues to walk in the halls loudly, whistling, singing and talking loudly to the residents.  SO Garcia has woken me up many times with this behavior.  I consider this to be harassment and a violation of my right to privacy
>
> I am requesting that the interference and harassment stop.  I am suggesting that SO Garcia be suspended or terminated, due to the amount of times this has occurred.

64.     Long before that, Plaintiff had complained about the abuse she suffers at the hands of her Tormentors.  For example, on March 5, 2014, Plaintiff wrote Owner about the various forms of abuse and harassment she was suffering, writing,

> I beg once again that you take my complaints seriously and that action be taken to allow me the peaceful living that I deserve as by law and a paying tenant. If this is not handled properly I will have no other alternative then to seek an attorney for advise and possible representation.

65.     Prior to that, on January 21, 2014, Plaintiff wrote a lengthy letter to the Owner detailing the events of the prior day, writing that after her noise complaints were ignored by Security Officer Garcia,

> Due to 9 months of having to deal with this issue, not getting anywhere with building management, whom is responsible for the

quality of life in the apartments that they rent out, I decided it would be best to talk with a supervisor in the New York Police Department. I did just that and the supervisor informed me that "Any resident that is leaving their door open is creating a fire hazard." The supervisor also said "If you can hear music from your apartment it is too loud." He said that he would send two officers over to the building to talk with the 2 tenants that I was complaining about.

When the police arrived [SO] Garcia came over and immediately began speaking with the female police officer. Telling the female police officer "she is always complaining (while referring to me), I go up when she complains and their music is not loud, . . . [SO] Garcia continued to take sides between the tenant of 3R and the Officer Edwards (male officer) as he was letting the tenant know that the tenant could not be yelling from his room out into the hall and he could not have his music up really loud.   During the conversation with the tenant of 3R he admitted to yelling for me to wake up and purposely turning his music up loud.   The tenant of 3R at one pointed stated "staff have told me it is okay to yell from my room, I have to yell out of my room to get the attention of my friend that is my neighbor (referring to 3P)." . . . At one point Garcia interrupted and said "you guys just need to get along, we cannot be having the police come for stuff like this, you both just need to work it out."

. . . [SO] Garcia was adamant about defaming my character to the police officers.   She stated to the police officers that the building management allows tenants to keep their doors open and "this is a building management issue not a police issue." She continued, "We have patients here that require us to check on them from time to time. That is why they leave their doors open. . . Then [SO Garcia addressed me and said "Ms. Lopez you just need to learn to get along with your neighbors." . . . at one point Officer Edwards told me "You have to listen to her." I replied that she is not staff, Officer Edwards said "Yes she is building management and you have to follow whatever directions she gives you."

In embarrassment and frustration from my character being defamed by [SO] Garcia to the Police Officers, I went back to my apartment. . . Due to her representation, I believe the police discredited my statements and complaints. . .

66.     Despite calling for police help dozens of times, the NYPD repeatedly has refused to take any criminal complaint from Plaintiff, except the one described in paragraph 79 of this Complaint.

67.     It is noteworthy that the NYPD Patrol Guide imposes a non-discretionary duty to accept all criminal complaints, defined as "an allegation of an unlawful or improper act or omission, or other condition that necessitates investigation to determine if any unlawful act or omission occurred."  NYPG Patrol Guide, Procedure No: 207-01.  Although a complaint might be closed as unfounded under NYPG Patrol Guide, Procedure No: 207-07, all complaints shall be recorded because, "[p]roper complaint reporting is essential for statistical analysis, discovery of crime patterns and trends, efficient deployment of resources, and uniform crime reporting. Every member of the service involved in this process has a responsibility and obligation to ensure the integrity of this vital, strategic resource."  NYPD Patrol Guide, Procedure No: 207-01.

68.     Further, NYPD officers have a nondiscretionary duty to report all allegations of misconduct against uniformed members of the service, including an allegation that an officer failed to take and file a complaint.  *See, e.g.,* NYPG Patrol Guide, Procedure No: 207-31.

69.     Proper reporting of criminal complaints is especially vital in the context of discrimination based upon gender expression, crimes which are under reported.

70.     It is equally noteworthy that the New York Hate Crime Law § 485.05 provides for a separate offense and additional penalties where a person commits a specified offense and selects either the criminal act or its victim in whole or in substantial part because of a belief or perception regarding a person's expression of their gender identity.

71.     Tormentors clearly selected Plaintiff in whole or substantial party because she is a person of trans experience.

72.     The specified offenses include the following provisions of the N.Y. Penal Law, all of which describe the Tormentors' conduct that has victimized Plaintiff:  § 240.25 harassment in the first degree; § 240.30 aggravated harassment in the second degree;  § 120.45 stalking in the fourth degree; § 120.50 stalking in the third degree; § 120.14 menacing in the second degree; and § 120.15 menacing in the third degree.

**D.     NYPD command structure ignored Plaintiff's pleas for help and colluded with the Private Party Defendants to violate Plaintiff's Constitutional rights.**

73.     In or about December 2014, Plaintiff went to the 28th Precinct and spoke to NYPD Officer Victor Pena.  After listening to the details of Plaintiff's complaints against her Tormentors and Owner's security officers, Officer Pena told Plaintiff that the NYPD would send NYPD officers to the Cecil Hotel to address Plaintiff's concerns, speak to her neighbors, and speak to Owner and its security officers.

74.     Plaintiff thereafter went to Owner's chief of security, Defendant Ralph Garcia. Plaintiff recounted her conversation with Officer Pena.  Defendant Ralph Garcia told Plaintiff that he is a retired NYPD lieutenant and communicated that he would "make a few calls" to assure that the NYPD did not respond to Plaintiff's complaints.

75.     Defendant Ralph Garcia, as the head of Owner's security, was aware of Plaintiff's complaints and the abuse she suffered and was kept apprised by the security officers he supervised of the events concerning Plaintiff's claims.

76.     Officer Pena's promises of NYPD assistance never materialized.

77.     In May, 2015, Plaintiff again went to the 28th Precinct to appeal for help. Plaintiff met with Deputy Inspector Obe, the commanding officer of the 28th Precinct, and explained in detail all of Plaintiff's ordeal and the nature of her complaints against her

Tormentors, Owners and their security officers, and the numerous NYPD Officer Doe defendants who had refused to take Plaintiff's complaints over the previous two years.

78.     Deputy Inspector Obe told Plaintiff that her concerns would be addressed, that Deputy Inspector Obe personally would come to speak to Plaintiff's Tormentors and Owners to mediate and resolve Plaintiff's concerns.  Deputy Inspector Obe's promises of NYPD assistance have not yet materialized.

79.     At that meeting with Deputy Inspector Obe, the NYPD accepted and filed a criminal complaint from Plaintiff against her Tormentor residing in apartment 3L.  Thereafter, however, the NYPD did not arrest, interview or otherwise restrain that person, any other Tormentor, or any other person at the Cecil Hotel in connection with Plaintiff's complaint.

80.     Last week, while suffering another hateful diatribe, Plaintiff struck one of her Tormentors in the face as he came close enough to physically intimidate her.  Another Tormentor grabbed Plaintiff and dragged her roughly down the hall before she escaped his grasp and left the building to get away.

81.     Owner then coordinated with the NYPD to effect an arrest of Plaintiff later that day at her apartment.  The NYPD arrested only Plaintiff and once again did not file a criminal complaint from Plaintiff.

82.     Owner then informed Plaintiff that the house rules require tenants to refrain from disturbing their neighbors and that Plaintiff no longer qualified for any of the social services previously provided to Plaintiff and otherwise available to the residents of the Cecil Hotel. Specifically, they told Plaintiff that she should be ashamed of herself for striking a neighbor.

83.     None of Plaintiff's Tormentors ever have been disciplined or penalized for their abuse of Plaintiff.

84.     Yesterday morning, Owner cancelled Plaintiff's psychiatric counseling session, scheduled for that day, and told Plaintiff Owner no longer feels comfortable offering her psychiatric services.  Plaintiff requested those services because two weeks ago she was so fixated on suicide she feared for her safety.

### COUNT I
(42 U.S.C. § 1983 - Officer Defendants)

85.     Plaintiff incorporates by reference each and every allegation contained in this Complaint.

86.     The Officer Defendants' culpable conduct relates to the official duties of a uniformed police officer discharging the police powers held and exercised by the state.  Those duties include to take and file complaints of criminal activity, to take and file a report of any culpable act or omission by a police officer, to investigate criminal activity and make arrests where probable cause exists to do so, and to respond to emergency situations.  The Officer Defendants therefore acted under color of state law because they exercised power possessed by virtue of state law and made possible only because they were clothed with authority of state law.

87.     The Officer Defendants knowingly violated Plaintiff's clearly established equal protection rights under the Fourteenth Amendment to the Constitution of the United States in at least two respects.

88.     First, the Officer Defendants repeatedly refused to discharge their non-discretionary duty to make and file a criminal complaint from Plaintiff -- against Tormentors, Owner and its security agents, and against the NYPD officers who had previously refused to take a complaint from Plaintiff -- and to investigate that complaint in a non-discriminatory manner.  By those affirmative acts, the Officer Defendants selectively withdrew from Plaintiff police protection services that would otherwise have been available in the community, and they did so

in whole or substantial part because Plaintiff is a person of trans experience, i.e., a member of a disfavored, but protected, class of persons.

89. It is noteworthy that 42 U.S.C. § 1983 is the contemporary codification of the Enforcement Act of 1871 -- also known as The Civil Rights Act of 1871 or the Ku Klux Klan Act -- which was passed during Reconstruction to address attacks on Fourteenth Amendment rights of persons of color. Such attacks specifically included the selective withdrawal of police protection from disfavored persons, which is a per se equal protection violation.

90. It is equally noteworthy that Officer Defendants violated their statutory duty to protect Plaintiff from Assailant's attacks motivated by Plaintiff's expression of her gender identity. Specifically, the Hate Crime Law, New York State Human Rights Law, New York Civil Rights Law, and City HRL all create a statutory duty and private right of action to protect the class of persons, including Plaintiff, who are of trans experience.

91. Second, the Officer Defendants facilitated the harm that Tormentors have inflicted upon Plaintiff and the danger that Plaintiff continually faces from her Tormentors by repeatedly communicating to Tormentors that Tormentors would not be arrested, punished, or otherwise interfered with while engaging in misconduct likely to endanger Plaintiff's life, liberty and property.

92. Officer Defendants' continued and public inaction in the face of Tormentors' escalating campaign of hate crimes, their active and public encouragement of Tormentors' criminal behavior by laughing and smiling at the jokes made at Plaintiffs' expense, and their refusal to discharge their statutory duty to protect Plaintiff from hate crimes and other crimes continues to embolden, encourage and condone Tormentors' criminal and abusive behavior, increasing the likelihood of violence against Plaintiff.

93.     By intentionally putting Plaintiff in harm's way then sitting back to watch her injury unfold, the Officer Defendants engaged in a deliberate and unconstitutional act designed to inflict extreme and unprovoked pain in their defenseless victim.  Their actions are no different, even if less direct, than chaining a person to a wall for days, or beating a person without provocation, or any other violence against a person.

94.     As described above, the relentless, daily endurance of her Tormentors' abuse has devastated Plaintiff physically, psychologically and emotionally.

95.     Separate from the damages caused by her Tormentors' conduct, the Officer Defendants abuse of Plaintiff inflicts a distinct, deeper harm all its own.  The Officer Defendants and the agents of their choosing repeatedly violated Plaintiff and did so publicly and with apparent impunity, despite Plaintiff's resort to the chain of command.  Those acts communicate to Plaintiff and her neighbors, family, and entire community that she is beneath the law, beneath civility, a plaything to be harmed or broken with impunity, less than human.  The Officer Defendants' conduct assaults Plaintiff's personal dignity in a way that no physical attack alone could and inflicts damages orders of magnitude beyond mere physical injury.

96.     Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

97.     Further, the Officer Defendants' inaction, over an extended period of time and in the face of the obvious risk to Plaintiff of severe consequences and extreme danger posed by Assailant's conduct, is proof that the Officers focused on the risk of their unconstitutional conduct and deliberately assumed or acquiesced in such risk.  The Officer Defendants therefore acted either with an evil and malicious intent to harm Plaintiff or with a deliberate and callous indifference to Plaintiff's federally protected rights.   Because of that positive element of

conscious wrongdoing and the reprehensibility of the Officer Defendants' conduct, Plaintiff is entitled to punitive damages against the Officer Defendants, in an amount to be determined at trial.

### COUNT II
(42 U.S.C. § 1983 - City of New York)

98.     Plaintiff incorporates by reference each and every allegation contained in this Complaint.

99.     The City's official custom or policy with respect to the NYPD's treatment of persons of trans experience is as follows:

(a)     to refuse to take or file criminal complaints relating to violence against people of trans experience;

(b)     to refuse to intervene to stop or abate crimes against persons of trans experience, even when witnessed by NYPD officers;

(c)     to investigate complaints of violence against persons of trans experience in a manner designed to frustrate the arrest or prosecution of the offenders; and

(d)     to encourage violence against persons of trans experience both directly and through the use of tactics designed to increase a person of trans experience's vulnerability to attack by non-state actors.

100.    Those customs and policies unjustifiably infringe upon Plaintiff's fundamental rights under the Fourteenth Amendment.

101.     The NYPD's mistreatment of people based upon their gender identity and expression is systemic and pervasive.  The NYPD's "quality of life" policing disproportionately impacts upon LGBT persons of color, both because of police perceptions rooted in racism,

gender-based phobia, and because of the homelessness and other social vulnerability that results from such persons being rejected by their families.

102.    In September of 2007, for example, the NYPD violently arrested and pepper-sprayed peaceful demonstrators at a celebration of the Sylvia Rivera Law Project, an organization that advocates for and provides free legal services to low-income people of color who are transgender.

103.    In 2011, the NYPD arrested a man of trans experience together with numerous other people at an Occupy Wall Street event.   All of the cis-gendered protesters arrested with him were processed and released promptly.   The NYPD chained the man of trans experience to a wall for eight hours, without provocation or cause, before processing and releasing him.

104.    In February 2012, the NYPD repeatedly humiliated a woman of trans experience with derogatory epithets and taunts after they arrested her.   The NYPD attached her to a fence, with her arm painfully chained above her head, for more than a day.

105.    The practice of chaining a person to a wall in the standing position, or with their arms stretched uncomfortably over their head, or into some other structure in some other position, is intended to inflict pain and suffering upon the victim and to expose the victim to violence from unrestrained arrestees and detainees with whom the victim is placed for the purpose of receiving such abuse or violence.   It is widely accepted and endorsed by the NYPD as a technique for abusing persons of trans experience.

106.    In June 2012, the City announced that negotiations between the City, NYPD and LGBT advocacy groups concerning the NYPD's practices had resulted in revisions to the NYPD Patrol Guide.   Those revisions included the practice of chaining persons of trans experience to benches and rails and other abuse of persons in police custody; the revisions do not address any

policy relating to the NYPD's treatment of persons of trans experience who are not arrestees or detainees of the NYPD, such as victims of a gender bias crime seeking to report that crime or seeking protection from their attacker.

107.    In August 2013, three women of trans experience were attacked by seven or more men who were enraged by their gender expression.  The women were beaten -- one of them to death -- right in front of the NYPD's Housing Bureau Precinct.  One assailant confessed a week after the murder but was not even indicted, for manslaughter not murder, until March 2015.

108.    On October 12, 2014, four men attacked and severely beat a woman of trans experience in Brooklyn, hurling slurs and epithets at her soul as they hurled fists and boards at her body.  The victim, an American Indian, suffered a traumatic brain injury.  She was beaten so badly that a portion of her skull had to be removed.  Advocates for the victim involved with the case publicly criticized the NYPD detectives for not working diligently.  No arrests were made.

109.    People of trans experience throughout New York City regularly are abused, and their Constitutional rights violated, by the NYPD's policy of discriminating against people of trans experience by refusing to accept from such persons criminal complaints and by encouraging violence against such persons.

110.    The pervasive reach of the NYPD's policy of mistreating people of trans experience is evidenced by Plaintiff's own experience suffering the same pattern of police misconduct over and over again.

111.    Further, just last week another person of trans experience commenced an action based upon the NYPD's repeated refusal to take his criminal complaint and the NYPD officers' other culpable acts undertaken to increase the victim's vulnerability to his non-state assailant.  Moreover, the officer defendants in that action -- *Marlow White v The City of New York et al.*,

United States District Court for the Southern District of New York, Case No. 15-cv-6696 (GHW/jlc) -- and the Officer Defendants in this action are all stationed at the 28th Precinct.

112.    By force of persistent practice, the City's official custom or policy of allowing officers to violate the civil rights of persons of trans experience by denying them police protection otherwise available in the community or, worse, to inflict pain and suffering upon them, and to do so without provocation and with impunity, was the moving force that caused the denial of Plaintiff's equal protection rights, resulting in Plaintiff's damages.

113.    These discriminatory practices of the City are so persistent and widespread as to constitute a custom or usage with the force of law, and the discriminatory acts of subordinate officers so manifest as to imply the constructive acquiescence of senior policy-making officials.

114.    Even if, and in the alternative, the finder of fact in this matter determines that the official custom or policy is not to discriminate against persons of trans experience, then the City's failure to properly train or supervise their subordinates in the comprehension and observation of that policy amounts to deliberate indifference to the rights of those who come in contact with the municipal employees.

115.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

## COUNT III
### (42 U.S.C. § 1983 - Private Party Defendants)

116.    Plaintiff incorporates by reference each and every allegation contained in this Complaint.

117.    The Private Party Defendants' culpable acts pertain to their coordinated, pre-arranged, collusive joint actions to deprive Plaintiff of the police protection otherwise available

in her community and to deprive Plaintiff of any recourse from the abuse and mistreatment at the hands of her Tormentors and the Private Party Defendants.

118.    The Private Party Defendants' culpable acts pertain also to their exercise of the public authority delegated to them by virtue of their contractual relationship with the City, through HPD, and in particular by virtue of the Officer Defendants' repeated delegation and deference to Owner and its security officers as the only forum where Plaintiff can seek redress as a crime victim.

119.    Accordingly, the Private Party Defendants acted under color of law in connection with their culpable conduct.

120.    As set forth above, Private Party Defendants' culpable conduct effected a clear violation of Plaintiff's constitutional rights to equal protection and due process of law, resulting in Plaintiff's damages.

121.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus punitive damages, reasonable attorneys' fees and costs.

122.    Further, the Private Party Defendants' inaction, over an extended period of time and in the face of the obvious risk to Plaintiff of severe consequences and extreme danger posed by her Tormentors' conduct, is proof that the Private Party Defendants focused on the risk of their unconstitutional conduct and deliberately assumed or acquiesced in such risk.  The Private Party Defendants therefore acted either with an evil and malicious intent to harm Plaintiff or with a deliberate and callous indifference to Plaintiff's federally protected rights.  Because of that positive element of conscious wrongdoing and the reprehensibility of the Private Party

Defendants' conduct, Plaintiff is entitled to punitive damages against the Private Party Defendants, in an amount to be determined at trial.

## COUNT IV
### (New York Civil Rights Law § 79-n -- Private Party Defendants)

123.    Plaintiff incorporates by reference each and every allegation contained in this Complaint.

124.    Private Party Defendants have inflicted harm upon Plaintiff in whole or in substantial part because of their belief or perception regarding Plaintiff's gender identity and expression.

125.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

126.    Further, Plaintiff is entitled to an injunction enjoining and restraining Private Party Defendants from any further violation of Plaintiff's equal protection rights based upon Plaintiff's gender identity and expression.

## COUNT V
### (New York City Human Rights Law - Private Party Defendants)

127.    Plaintiff incorporates by reference each and every allegation contained in this Complaint.

128.    Plaintiff is the victim of unlawful, discriminatory harassment and violence at the hands of Private Party Defendants.

129.    Defendants' discriminatory conduct has interfered with Plaintiff's exercise or enjoyment of her rights as secured by the constitution or laws of the United States, the constitution and laws of the State of New York, and the laws of the City of New York.

130.     Defendants' interference with Plaintiff's rights is motivated in whole or in part by Plaintiff's actual or perceived gender identity and expression.

131.     Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

132.     Further, Plaintiff is entitled to an injunction enjoining and restraining Private Party Defendants from any further violation of Plaintiff's equal protection rights based upon Plaintiff's gender identity and expression.

133.     Further still, Plaintiff is entitled to punitive damages against the Private Party Defendants, in an amount to be determined at trial.

## COUNT VI
(New York Executive Law § 290 *et seq*. - Private Party Defendants")

134.     Plaintiff incorporates by reference each and every allegation contained in this Complaint.

135.     Plaintiff is the victim of unlawful, discriminatory harassment and violence at the hands of Private Party Defendants.

136.     Private Party Defendants' unlawful discriminatory conduct against Plaintiff is motivated in whole or in part by Plaintiff's actual or perceived gender identity and expression and has caused Plaintiff's damages.

137.     Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus punitive damages, reasonable attorneys' fees and costs.

138.     Further, Plaintiff is entitled to an injunction enjoining and restraining Private Party Defendants from any further violation of Plaintiff's equal protection rights based upon Plaintiff's gender identity and expression.

## COUNT VII
(Injunction -- all Defendants)

139.    Plaintiff incorporates by reference each and every allegation contained in this Complaint.

140.    Plaintiff is entitled to permanent and preliminary injunctive relief in connection with her federal claims because Plaintiff can demonstrate the imminent threat of irreparable harm and a substantial likelihood of success on the merits.  Specifically, in the absence of injunctive relief, Plaintiff certainly will continue to bear the unrelenting physical and emotional stress of constant vulnerability to attack by her Tormentors, precisely the sort of irreparable injury for which there is no adequate remedy at law and for which injunctive relief is appropriate and necessary.  In any event, irreparable harm is presumed here because Plaintiff alleges deprivation of her rights secured by the Fourteenth Amendment to the Constitution of the United States. Further, Plaintiff can demonstrate a substantial likelihood of success on the merits against all Defendants.

141.    Plaintiff is entitled to permanent and preliminary injunctive relief related to her state law claims because Plaintiff can demonstrate that Defendants' discriminatory conduct has interfered with Plaintiff's exercise or enjoyment of her rights under state and federal law and that Defendants have selected Plaintiff for harm in whole or in substantial part because of Defendants' belief or perception regarding Plaintiff's gender identity and expression.  Pursuant to New York Civil Rights Law § 79-n and the New York City Human Rights Law, those facts entitle Plaintiff, without any further showing of damages, to an injunction enjoining any further violation of Plaintiff's rights.

142.    Accordingly, Plaintiff is entitled to a preliminary and permanent injunction: (i) enjoining the Officer Defendants and the City from engaging in any further discriminatory conduct against Plaintiff; (ii) directing the City to take and file Plaintiff's complete criminal complaint against her Tormentors and to investigate that complaint in a non-discriminatory manner; (iii) directing the City to examine and adjust its polices and practices to assure that respect is afforded to the human and civil rights of all persons, including persons of trans experience; and (iv) awarding Plaintiff such other and further relief as is just and proper.

**Pursuant to the Seventh Amendment to the Constitution of the United States and Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.**

**WHEREFORE**, plaintiff respectfully prays for judgment against Defendants as follows:

(1)    that Officer Defendants and the City of New York, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with the City who receive actual notice of the Court's order by personal service or otherwise, be permanently directed as follows: (i) to forbear from engaging in any further discriminatory conduct against Plaintiff; (ii) to take and file Plaintiff's complete criminal complaint against her Tormentors and to investigate that complaint in a non-discriminatory manner; (iii) to examine and adjust its polices and practices to assure that respect is afforded to the human and civil rights of all persons, including persons of trans experience.

(2)     awarding Plaintiff compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000;

(3)     awarding Plaintiff punitive damages, against the Officer Defendants and Private Party Defendants, in an amount to be determined at trial;

(5)     awarding Plaintiff interest, including pre-judgment interest, on the foregoing sums;

(6)     awarding Plaintiff her costs in this civil action, including reasonable attorneys' fees and expenses, pursuant to 42 U.S.C. § 1983; and

(7)     awarding Plaintiff such other and further relief as the Court may deem just and proper.


Dated: Bronx, New York
        September 4, 2015

                          LAW OFFICE OF DONALD R. DUNN, JR.


                          By: _____/S/_____
                               Donald R. Dunn, Jr. (DD0069)

                          441 East 139th Street
                          Bronx, New York 10454
                          347-270-1863
                          Donald@drdunnlaw.com