UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| JENNIFER LOUISE LOPEZ, | : ECF Case |
| Plaintiff, | : |
| | : Case No. 15-cv-7020 (UA) |
| -against- | : |
| THE CITY OF NEW YORK, NYPD OFFICERS DOE1-20, CECIL HOUSING DEVELOPMENT FUND CORPORATION, HOUSING AND SERVICES, INC., and RALPH GARCIA, | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF HER MOTION FOR A PRELIMINARY INJUNCTION

Donald R. Dunn, Jr. (DD0069)
Law Office of Donald R. Dunn, Jr.
441 East 139th Street
Bronx, New York 10454
Telephone: (347) 270-1863
Email: Donald@drdunnlaw.com

*ATTORNEY FOR PLAINTIFF*

## PRELIMINARY STATEMENT

The Constitution created the framework whereby the government, with the consent of the governed, is vested with enormous power to create and regulate our systems of government, commerce, common defense and other means of providing the material things required to sustain human life.  Of course, every form of government from despotism to dictatorship recognizes the frailty of the physical human condition and provides for those material necessities.  What makes our democracy special is that as a government of and by the people our Constitution also recognizes the dignity and strength of the human spirit.  It secures not merely one's life but also the opportunity to find meaning and salvation with the gift that is the experience of being alive.

The Constitution therefore was thoughtfully crafted to secure for all persons the fundamental freedom to contemplate the universal human inclination towards the spiritual, to cultivate one's inner core of highest human potential by acting in an open and honest way according to the dictates of one's conscience; to be one's self.  See, e.g., Olmstead v. United States, 277 U.S. 438, 478 (1928) (Brandeis, J) ("The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. . . They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations."). That fundamental freedom is articulated in the Constitution as our most treasured rights to free speech, free assembly, freedom of religion, freedom from unreasonable searches, and to equal protection and due process of law.

Those specifically enumerated rights, however, all flow from our most fundamental freedom, the freedom to follow one's conscience and be one's self.  The Constitution does not specifically enumerate that fundamental freedom because to our founders it was a "self-evident" truth that all humans "are endowed by their Creator with certain unalienable rights, that among these are Life, Liberty and the pursuit of Happiness." Declaration of Independence § 1.

Our founders did not opine on what it means to pursue happiness because, fundamentally, "happiness cannot be pursued; it must ensue" as a consequence of taking responsibility for one's life by acting according to the dictates of one's conscience.[1]  "What is the meaning of my life" is not a question that we get to ask.  Rather, it is the question our existence poses to each of us. Only by speaking, assembling, worshipping and otherwise living according to the dictates of one's conscience, in an open and honest way, can one hope to find the happiness that ensues through the meaning and purpose created by taking responsibility for one's life with one's actions.  To pursue happiness therefore is to exercise the fundamental freedom to find one's own meaning and purpose in life, to be and express our true selves.

Life, liberty and the pursuit of happiness is not merely a rallying cry of the American revolution or the credo of American constitutional democracy.  The indispensable purpose for which the Constitution exists is to secure the freedom to express one's true self, to pursue happiness.  See, e.g., Washington v. Glucksberg, 521 U.S. 702, 761 (1997) (Souter, J., concurring) (the Fourteenth Amendment protects "the right of the individual . . . generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.") quoting Meyer v. Nebraska, 262 U.S. 390, 399 (1923).  The expediency of even our most vital social institution must yield to the Constitutional protection of that fundamental freedom.  This is a case about that most fundamental freedom.

Plaintiff is a woman of trans experience.  Her journey typifies that of other people who, like Plaintiff, courageously decided to take responsibility for their life with their actions and to

---

[1] Frankl, Viktor E.  *Man's Search for Meaning: An Introduction to Logotherapy*. New York: Simon & Schuster, 1984.  ("For success, like happiness, cannot be pursued; it must ensue, and it only does so as the unintended side effect of one's personal dedication to a cause greater than oneself or as the by-product of one's surrender to a person other than oneself . . . listen to what your conscience commands you to do and go on to carry it out to the best of your knowledge. . . Ultimately, man should not ask what the meaning of his life is, but rather must recognize that it is he who is asked. In a word, each man is questioned by life; and he can only answer to life by answering for his own life; to life he can only respond by being responsible."  Id.

live openly according to the dictates of their conscience.  For Plaintiff, that means to be and live as a woman, even though doing so subjects her to scorn, rejection, and criminal threats to her life and safety at staggeringly disproportionate rates.  Unfortunately, that also means that Plaintiff, like many other persons of trans experience, has been victimized by the NYPD's systemic and pervasive policy of refusing to accept criminal complaints from persons of trans experience, refusing to investigate such complaints in a non-discriminatory manner, and using tactics to inflict pain upon persons of trans experience in non-obvious ways, such as increasing the victim's vulnerability to non-state actors.

Plaintiff has for two years been the victim of an ongoing series of harassment, threats, intimidation and other hate crimes, perpetrated by her neighbors and her landlords, defendants Cecil Housing Development Corporation, Inc. ("Cecil HDFC") and Housing and Services, Inc. ("Housing Inc.") (collectively, the "Owner").  Each time Plaintiff calls 911, the NYPD's responding officers treat Plaintiff with disdain or even contempt, refuse to render any assistance to Plaintiff, and refuse to file a criminal complaint from her.  When Plaintiff twice appealed to the NYPD 28th Precinct's command structure, she was promised that she would be afforded equal protection.  Instead, the NYPD did nothing.  The Owner's chief of security, a retired NYPD lieutenant, later said he "made a few calls" to his friends at the NYPD.

Accordingly, Jennifer Louise Lopez ("Plaintiff") respectfully submits this Supplemental Memorandum of Law In Support of her motion for a preliminary injunction enjoining defendants Owners and The City of New York ("City") from engaging in any further discriminatory conduct against Plaintiff based upon Plaintiff's expression of her gender identity.

## STATEMENT OF RELEVANT FACTS

Like far too many persons of trans experience, Plaintiff was rejected by her family after coming out and found herself homeless in New York City.  In the spring of 2013, Plaintiff

applied for a subsidized room at the Cecil Hotel, Owner's SRO building offering subsidized housing through the auspices of non-party agency New York City Housing Preservation and Development ("HPD") and funded by public money from the United States Department of Housing and Urban Development ("HUD") and HPD.  See, e.g., Complaint,[2] Exhibit 1 to the accompanying Declaration of Jennifer Louise Lopez, dated September 10, 2015 ("Lopez Dec."), ¶¶ 14-18, 35-40.  See also HPD Subsidy Notice, Exhibit 2 to the Lopez Dec.; Plaintiff's and Owner's Lease, Exhibit 3 to the Lopez Dec.; and Plaintiff's and Owner's Lease Renewal, Exhibit 4 to the Lopez Dec.  Based upon Owner's specific assurances that the Cecil Hotel would provide a safe, supportive home environment specifically accepting of persons of trans experience, Plaintiff signed her Lease and moved into her room at the Cecil Hotel on April 1, 2013. See, e.g., id.  See also Cecil Hotel's House Rules, Exhibit 5 to the Lopez Dec.

Within a few weeks, the whispers of "is that a man?" became accusatory statements of "That's a man!" "Look at that man!" See, e.g., Complaint, Exhibit 1 to the Lopez Dec., ¶¶ 41-42. When her abusive neighbors ("Tormentors") saw that Plaintiff's complaints and requests for help to the Owner were deflected or resulted in Owner's retribution or ridicule towards Plaintiff, they became increasingly abusive and threatening to Plaintiff, and they did so in whole or substantial part because of Plaintiff's honest expression of her gender identity.  See, e.g., id. at ¶ 43.  Within three months of moving into the Cecil Hotel, and ever since then, Plaintiff has endured near-constant abuse that disturbs her sense of well being and compromises her physical and mental health.  Her Tormentors go out of their way to hurl the words "man" and "he" and "bastard" at Plaintiff as if it were Plaintiff's name.   Plaintiff endures being awoken to her Tormentors shouting vulgar epithets that cannot be repeated in this forum, many aimed in one way or another at Plaintiff's expression of her gender identity. See, e.g., id. at 43-44.

---

[2] The allegations contained in the Complaint have been sworn to under penalty of perjury by Plaintiff and therefore have the same evidentiary weight as any other written, sworn testimony.

For example, Plaintiff has adopted a largely nocturnal lifestyle to minimize contact with her neighbors.  One favorite tactic of her Tormentors is to scream and play loud music purposefully to wake Plaintiff up, then turn it down when security arrives, then back up, and on and on.  As the Tormentor residing in apartment 3K once screamed at Plaintiff, after the police had left once again without taking a complaint from Plaintiff, "If you think this is that loud wait till I get this next [radio] box, you ain't never going to sleep." <u>See</u>, <u>e.g.</u>, Complaint, Exhibit 1 to the Lopez Dec., ¶ 49.  Another running "joke" amongst the Tormentors is to accuse Plaintiff of fouling the shared bathrooms in loud, obscene language designed to derogate Plaintiff for her gender expression, with explicit references to her genitalia and appearance. <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶ 50.

Over the past two years, Plaintiff has called for police assistance dozens of times but <u>every</u> time has been denied her right as a crime victim to file a criminal complaint. <u>See</u>, <u>e.g.</u>, Complaint, Exhibit 1 to the Lopez Dec., ¶ 66.  In each instance where the NYPD responded, Owner and its security officers interfere with Plaintiff's attempts to exercise her right as a crime victim to file a criminal complaint with the NYPD, falsely represented that Plaintiff's dispute was part of a special "program" that would be addressed as part of the "program" by the "program coordinator," falsely implying that the Cecil Hotel's tenants were under some legal impairment.  <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶¶ 45-46.  Upon hearing the word "program," the NYPD's officers invariably abdicate their police powers to Owner, telling Plaintiff that her complaints against her Tormentors must be addressed to Owner and that Plaintiff cannot file any complaint with the NYPD. <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶ 59.  Owner's employee, Security Officer Garcia, frequently referred to Plaintiff dismissively as "Jennifer Lopez" or "J Lo" to the NYPD's various responding officers, almost always eliciting a smile or chuckle from the officers.  <u>Id</u>.

For example, on April 19, 2015, the Tormentor who resides in apartment 3R began to yell through Plaintiff's door, "I am going be very sorry that I did not kill him [Plaintiff], I am tired of

this shit.  I want to go to jail today for the first time, you come out that room, come out that room, I am not playing neither come on out of that room, they going to take my ass to jail today."  When the NYPD responded to Plaintiff's call for help, Security Officer Garcia once again told the NYPD officers that the "program" would take care of the issue and the responding officers turned on a dime and left, refusing to take any complaint from Plaintiff.  <u>See</u>, <u>e.g.</u>, Complaint, Exhibit 1 to the Lopez Dec., ¶ 61.  As a further example, in or about July 2013, the Tormentor residing in apartment 3P propositioned Plaintiff for sex.  On a prior occasion, he had threatened to kill Plaintiff.  On each occasion, the NYPD responded, Security Officer Garcia, Owner's security guard, told the responding officers that the issue would be addressed with the "Program Coordinator" the next day.  The NYPD officers then told Plaintiff that all complaints must be addressed to Owner.  Plaintiff told the responding officers, "he said he would kill me," to which one officer responded, "that's not a crime."  <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶ 60.

It is noteworthy that the NYPD Patrol Guide imposes a non-discretionary duty to accept all criminal complaints, defined as "an allegation of an unlawful or improper act or omission, or other condition that necessitates investigation to determine if any unlawful act or omission occurred."  <u>See</u> NYPG Patrol Guide, Procedure No: 207-01, Exhibit 14 to the Lopez Dec. Although a complaint might be closed as unfounded under NYPG Patrol Guide, Procedure No: 207-07 (Exhibit 15 to the Lopez Dec.), all complaints shall be recorded because, "[p]roper complaint reporting is essential for statistical analysis, discovery of crime patterns and trends, efficient deployment of resources, and uniform crime reporting. Every member of the service involved in this process has a responsibility and obligation to ensure the integrity of this vital, strategic resource."  <u>See</u> NYPD Patrol Guide, Procedure No: 207-01, Exhibit 14 to the Lopez Dec.  Further, NYPD officers have a nondiscretionary duty to report all allegations of misconduct against uniformed members of the service, including an allegation that an officer

failed to take and file a complaint. <u>See</u> NYPD Patrol Guide, Procedure No: 207-31, Exhibit 16 to the Lopez Dec.

It is equally noteworthy that the New York Hate Crime Law § 485.05 provides for a separate offense and additional penalties where a person commits a specified offense and selects either the criminal act or its victim in whole or in substantial part because of a belief or perception regarding a person's expression of their gender identity.   The specified offenses include the following provisions of the N.Y. Penal Law, all of which describe the Tormentors' conduct that has victimized Plaintiff:   § 240.25 harassment in the first degree; § 240.30 aggravated harassment in the second degree;  § 120.45 stalking in the fourth degree; § 120.50 stalking in the third degree; § 120.14 menacing in the second degree; and § 120.15 menacing in the third degree.

Plaintiff wrote to Owner numerous times to complain about Owner's failure to enforce its House Rules in a non-discriminatory manner and interference with Plaintiff's right as a crime victim to file a criminal complaint. <u>See</u>, <u>e.g.</u>, Complaint, Exhibit 1 to the Lopez Dec., ¶¶ 62-65. <u>See also</u> examples of those communications from Plaintiff to Owner, annexed to the Lopez Dec. as Exhibits 6-13.

In or about December 2014, Plaintiff went to the 28th Precinct and spoke to NYPD Officer Victor Pena.   After listening to the details of Plaintiff's complaints against her Tormentors and Owner's security officers, Officer Pena told Plaintiff that the NYPD would send NYPD officers to the Cecil Hotel to address Plaintiff's concerns, speak to her neighbors, and speak to Owner and its security officers.  <u>See</u>, <u>e.g.</u>, Complaint, Exhibit 1 to the Lopez Dec., ¶ 73. Plaintiff thereafter went to Owner's chief of security, Defendant Ralph Garcia.   Plaintiff recounted her conversation with Officer Pena.  Defendant Ralph Garcia told Plaintiff that he is a retired NYPD lieutenant and communicated that he would "make a few calls" to assure that the

NYPD would refuse to respond to Plaintiff's complaints, which is exactly what happened. <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶¶ 74-76.

In May, 2015, Plaintiff again went to the NYPD's 28th Precinct to appeal for help. Plaintiff met with Deputy Inspector Obe, the commanding officer of the 28th Precinct, and explained in detail all of Plaintiff's ordeal and the nature of her complaints against her Tormentors, Owners and their security officers, and the numerous NYPD Officer Doe defendants who had refused to take Plaintiff's complaints over the previous two years. <u>See</u>, <u>e.g.</u>, Complaint, Exhibit 1 to the Lopez Dec., ¶ 77. Deputy Inspector Obe told Plaintiff that her concerns would be addressed and that Deputy Inspector Obe personally would come to speak to Plaintiff's Tormentors and Owners to mediate and resolve Plaintiff's concerns; none of those promises have materialized. <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶¶ 78-79.

Last week, while suffering another hateful diatribe, Plaintiff struck one of her Tormentors in the face as he came close enough to physically intimidate her. Another Tormentor grabbed Plaintiff and dragged her roughly down the hall before she escaped his grasp and left the building to get away. <u>See</u>, <u>e.g.</u>, Complaint, Exhibit 1 to the Lopez Dec., ¶ 80. Owner then coordinated with the NYPD to effect an arrest of Plaintiff later that day at her apartment. The NYPD arrested only Plaintiff and once again did not file a criminal complaint from Plaintiff. <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶ 81. Owner then informed Plaintiff that the house rules require tenants to refrain from disturbing their neighbors, that Plaintiff no longer qualified for any of the social services previously provided to Plaintiff and otherwise available to the residents of the Cecil Hotel, and that Plaintiff that she should be ashamed of herself for striking a neighbor. <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶¶ 82-83. On September 3, 2015, Owner cancelled Plaintiff's psychiatric counseling session, scheduled for that day, and told Plaintiff Owner no longer feels comfortable offering her psychiatric services; Plaintiff requested those services because two weeks ago she was so fixated

on suicide she feared for her safety.  <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶ 84.  None of Plaintiff's Tormentors ever have been disciplined or penalized for their abuse of Plaintiff.  <u>See</u>, <u>e.g.</u>, <u>id</u>. at ¶ 83.  Plaintiff commenced this action the next day.

## ARGUMENT

As a preliminary matter, Plaintiff seeks injunctive relief to ameliorate violations of her fundamental rights inflicted by the City's policy of refusing to accept criminal complaints from persons of trans experience, refusing to investigate such complaints in a non-discriminatory manner, and using tactics to inflict pain upon persons of trans experience in non-obvious ways, such as increasing the victim's vulnerability to non-state actors.  Because the challenged policies implicate her fundamental rights under the Fourteenth Amendment, those policies are subject to heightened judicial scrutiny.

Defendants' conduct cannot withstand this Court's scrutiny and Plaintiff is entitled to the relief she requests because she can satisfy each of the four elements applicable to her request for a preliminary injunction: (1) irreparable harm in the absence of injunctive relief; (2) a substantial likelihood of success on the merits of his claims; (3) that the balance of the equities favors injunctive relief; and (4) that the public interest is served by a injunctive relief.  <u>See</u>, <u>e.g.</u>, <u>Ligon v. City of New York</u>, 925 F. Supp. 2d 478, 486 (S.D.N.Y. 2013).

## I.    DEFENDANTS' CONDUCT IS SUBJECT TO HEIGHTENED SCRUTINY.

Where a challenged policy violates a fundamental right or disproportionately impacts a suspect class, the Fourteenth Amendment requires strict scrutiny of that conduct.  <u>See</u>, <u>e.g.</u>, <u>Dandamudi v. Tisch</u>, 686 F.3d 66, 72 (2d Cir. 2012).  Here, Plaintiff seeks injunctive relief to ameliorate the discriminatory effects of the City's policy of refusing to take lawful criminal complaints from persons of trans experience and of encouraging or condoning tactics that inflict non-obvious injury upon persons of trans experience, such as by increasing their vulnerability to

attack by non-state actors.  Strict scrutiny of that policy is required because persons of trans experience are a suspect class, because gender expression discrimination is a form of sex-based discrimination that independently requires heightened scrutiny, and because Plaintiff's honest expression of her gender identity is a fundamental right under the  Fourteenth Amendment.

### A.    Persons of Trans Experience Are A Suspect Class.

When the Second Circuit extended the Supreme Court's Fourteenth Amendment rational review jurisprudence to strike down as unconstitutional the Defense of Marriage Act, it held for the first time that sexual orientation was a quasi-suspect class requiring heightened scrutiny.  Windsor v. United States, 699 F.3d 169, 181 (2d Cir. 2012), aff'd, 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013).  The Court based that holding on its analysis of the four governing factors, concluding that "A)  homosexuals as a group have historically endured persecution and discrimination;  B) homosexuality has no relation to aptitude or ability to contribute to society; C) homosexuals are a discernible group with non-obvious distinguishing characteristics . . . ; and D) the class remains a politically weakened minority."  Id. at 181-182.

It is striking that violence against the LGBT community is increasing at a time when the incidence of hate crimes overall are dropping, and the overwhelming majority of that violence is against persons of trans experience.  For example, 72% of anti-LGBTQ homicide victims are women of trans experience and 67% are trans women of color.  See, e.g., Complaint, Exhibit 1 to the Lopez Dec., ¶ 28.  All of the facts relied upon by the Second Circuit in Windsor compel even more forcefully the conclusion that persons of trans experience are also a quasi-suspect class. See also, e.g., Brief for the United States as Amicus Curiae Supporting Petitioner in *Obergefell v Hodges*, Exhibit 20 to the Lopez Dec.

It is true that the Supreme Court in affirming Windsor specifically excluded the Second Circuit's holding regarding a quasi-suspect class.  See United States v. Windsor, 133 S. Ct. 2675,

2718-19, 186 L. Ed. 2d 808 (2013) (Kennedy, J., "I would not presume to enshrine either vision of marriage in our constitutional jurisprudence . . . arrogating to ourselves the power . . . ").  The Supreme Court, however, reversed that course this summer in <u>Obergefell v. Hodges</u>, holding that the unenumerated, fundamental rights protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment include the right to enter marriage with a person of either gender.  <u>Obergefell v. Hodges</u>, 135 S. Ct. 2584, 2604, 192 L. Ed. 2d 609 (2015).  Accordingly, it is appropriate to extend the Second Circuit's holding in <u>Windsor</u> to persons of trans experience.

### B.    Discrimination Based On Gender Expression Is Sex-Based Discrimination.

The Constitution's equal protection guarantees prohibit discrimination based upon sex and any law that classifies on the basis of sex is subject to heightened judicial scrutiny and must be struck down absent an "exceedingly persuasive justification" and a showing that such laws substantially further important governmental interests.  <u>See</u>, <u>e.g.</u>, <u>United States v. Virginia</u>, 518 U.S. 515, 533-34 (1996).

A person's "sex" refers to immutable biological characteristics of the human being as male or female, independent of social or political context.  A person's "gender," on the other hand, has only a tenuous connection to biology and is almost entirely a social construct of what it means to be or act like a "masculine" or "feminine" person.  Considering the totality of the differences between the social expectations for men and women in child rearing, family, worship, art, sex, education, politics and every other area of human endeavor, the differences between "masculine" and "feminine" have little to do with the purely biological difference between a male and a female.  Like all social constructs, the concept of gender varies widely between cultural contexts and over time.

We all have a gender identity and numerous means of gender expression.  A person who finds themselves in a cultural context where their personal gender identity and means of gender

expression comport with the social expectations of how a biologically male or female person should behave are referred to as cis-gendered.  Trans-gender refers to a person whose personal gender identity and means of gender expression does not match society's expectations.

The social expectations imposed by the concept of "gender" imposed solely because of the condition of one's genitalia at birth, are an impermissible basis to restrict a person's free exercise of their liberty.  It is unconstitutional to tell a person they cannot work, speak, worship, marry or live according to their conscience just because some people don't believe that a person born with one set of genitalia or the other should behave that way.  Discrimination based upon gender expression is exactly that, disparate or malicious treatment directed at its victim because of a belief that a person born with one set of genitalia or the other should behave that way.  All policies based upon such overbroad gender stereotypes and should be subject to heightened scrutiny.  See, e.g., Glenn v. Brumby, 663 F.3d 1312, 1317 (11th Cir. 2011) (collecting cases ) (holding discrimination against a person of trans experience constitutes sex discrimination).

### C.   The Honest Expression of Gender Identity Is A Fundamental Right.

This summer, the Supreme Court held for the first time that the fundamental rights protected by the Fourteenth Amendment include the right to enter marriage with a person of either gender.  Obergefell v. Hodges, 135 S. Ct. 2584, 2608, 192 L. Ed. 2d 609 (2015).  It is appropriate, in the wake of Obergefell and for the reasons set forth in the Preliminary Statement of this Memorandum, to hold that if our fundamental rights include the right to choose to marry a person of either, certainly it is an even more fundamental right to choose to marry, love or live as a person of either gender.  Here, as in Obergefell, Plaintiffs "ask for equal dignity in the eyes of the law. The Constitution grants them that right."  Obergefell, 135 S. Ct. at 2608.

Defendants' conduct therefore is subject to strict scrutiny or at least heightened scrutiny. As set forth below, however, even under a rational review standard Defendants' conduct is so egregious as to violate Plaintiff's equal protection rights under the Fourteenth Amendment.

## II.   PLAINTIFF IS SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF.

The existence of irreparable harm, an injury that money cannot remedy, is the most important and significant of the four injunction factors.   See, e.g., Goldblatt v. Englander Commc'n, L.L.C., 431 F.Supp.2d 420, 424–25 (S.D.N.Y.2006).   Here, Plaintiff's allegation of violations of her Constitutional rights is sufficient, without more, to constitute a finding of irreparable harm sufficient to satisfy the preliminary injunction standard.   See, e.g., Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir.1996) and Statharos v. New York City Taxi and Limousine Comm'n, 198 F.3d 317, 322 (2d Cir.1999).

Further, Defendants' conduct has devastated Plaintiff, whose physical and mental health have deteriorated as a result of the chronic anxiety that comes with knowing that her Tormentors will always be there and that Plaintiff has absolutely no one to call for help when he does.   The City's abuse of Plaintiff inflicts a distinct, deeper harm all its own, repeatedly and publicly violating Plaintiff, despite Plaintiff's obvious resort to the NYPD chain of command.   Those acts communicate to Plaintiff's neighbors, family, to Plaintiff's entire community, that she is beneath the law, beneath civility, a plaything to be harmed or broken with impunity, less than human. Defendants' conduct assaults Plaintiff's dignity in a way that no physical attack alone could and inflicts damages orders of magnitude beyond mere physical injury and that cannot be compensated by money damages.

### III.     PLAINTIFF HAS A SUBSTANTIAL LIKELIHOOD OF SUCCESS.

#### A.     42 U.S.C. Claims against Officer Defendants and Owners.

To prevail on her claims against the Officer Defendants and Owners, Plaintiff must demonstrate that they acted under color of state law and that by those acts deprived Plaintiff of her rights as secured rights or privileges secured by the Constitution or laws.  See, e.g., Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir.2010).  Plaintiff can satisfy both prongs of that standard.

First, all of the Officer Defendants' culpable conduct relates to their exercise of power possessed by virtue of state law and made possible only because they were clothed with authority of state law, powers including to take and file complaints of criminal activity, to take and file a report of any culpable act by a police officer, to investigate criminal activity and make arrests where probable cause exists to do so, to respond to emergency situations, etc..  See, e.g., Complaint ¶¶ 62-66.  The Officer Defendants clearly acted under color of law.  Because the Owners acted in collusion with the Officer Defendants (id. at ¶¶ 73-81, and pursuant to the police-power authority apparently and openly granted to Owners by the Officer Defendants and City (id. at ¶¶ 44, 59), they also acted under color of law.  See, e.g., Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001).

Second, the Officer Defendants and Owners violated Plaintiff's equal protection rights. As a general matter, the state is not liable for harm caused by private actors even ifs agents stand by and do nothing, because the Supreme Court has held that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 195 (1989).  The rule of DeShaney, however, is subject to important exceptions that apply here.  Specifically, Plaintiff can demonstrate a violation of her equal protection rights in two, independent ways: the Officer Defendants and Owners selectively

withdrew police protection from Plaintiff because she is a disfavored person, and the Officer Defendants and Owners have facilitated Plaintiff's vulnerability to her Tormentors.

### (1)    Selective withdrawal of police services.

The selective withdrawal of protective police services from disfavored minorities is a per se violation of the Equal Protection Clause.  See, e.g., Carmichael v. City of New York, 34 F. Supp. 3d 252, 261 (E.D.N.Y. 2014), quoting DeShaney, 489 U.S. 189, 197 n. 3 and citing Pyke v. Cuomo, 258 F.3d 107, 109–110 (2d Cir.2001), Estate of Macias v. Ihde, 219 F.3d 1018, 1028 (9th Cir.2000), and Neighborhood Action Coal. v. City of Canton, 882 F.2d 1012, 1017 (6th Cir.1989).  See also Myers v. Cnty. of Orange, 157 F.3d 66, 74-75 (2d Cir. 1998).  "Indeed, the 'selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection.'" Carmichael 34 F. Supp. 3d at 261, quoting Hilton v. City of Wheeling, 209 F.3d 1005, 1007 (7th Cir.2000).

To prevail under this theory, of course, Plaintiff must establish that she was treated differently than others similarly situated and that his disparate treatment was motivated by discriminatory intent based upon impermissible considerations.  See, e.g., Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F.Supp.2d 679, 692 (S.D.N.Y.2011), quoting Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir.1995).  Plaintiff can establish both of those facts.

First, Plaintiff can readily demonstrate that she was treated differently from similarly situated persons in several material respects.  The NYPD Patrol Guide imposes upon its officers a non-discretionary duty to accept all criminal complaints because, "[p]roper complaint reporting is essential for statistical analysis, discovery of crime patterns and trends, efficient deployment of resources, and uniform crime reporting. Every member of the service involved in this process has a responsibility and obligation to ensure the integrity of this vital, strategic resource."  NYPD

Patrol Guide, Procedure No: 207-01, Exhibit 14 to the Lopez Dec.   The NYPD's officers, including the Officer Defendants, must ordinarily respond to situations in accordance with those non-discretionary procedures and established law when approached by a victim to file a complaint of unlawful acts, but Officer Defendants treated Plaintiff differently.   Plaintiff repeatedly was denied the right to make a criminal complaint against her Tormentors, however.

Second, Plaintiff can demonstrate that her disparate treatment was motivated by discriminatory intent based upon Plaintiff's status as a person of trans experience.   As a preliminary matter, the best evidence of purposeful discriminatory intent is demeanor.  See, e.g., Miller–El v. Cockrell, 537 U.S. 322, 338 (2003) (citation omitted); see also, McKinney v. Artuz, 326 F.3d 87, 98 (2d Cir.2003).   Here, Plaintiff credibly alleges that the Officer Defendants smiled and joked about her expression of her gender identity and treated her with disdain.  See, e.g., Complaint, Exhibit 1 to the Lopez Dec., ¶¶ 45-47.

Plaintiff can establish an equal protection violation because the NYPD selectively withdrew from Plaintiff police protection otherwise available in the community, and did so solely because Plaintiff is a woman of trans experience.

### (2)   State-facilitated danger.

Even though mere police inaction does not ordinarily give rise to a constitutional violation, such a violation does occur where the police officers "in some way had assisted in creating or increasing the danger to the victim."   Dwares v. City of New York, 985 F.2d 94, 99 (2d Cir. 1993), citing Freeman v. Ferguson, 911 F.2d 52 (8th Cir.1990).  According to this state-facilitated danger rule, where an affirmative act by a state actor interferes with the protective services otherwise been available in the community, and by that interference either increases the victim's vulnerability to the actions of a private person or ratifies and condones that private person's violent acts, the state actor is liable for the harm caused by the private person and a

constitutional violation occurs.  See, e.g., id.  See also Okin v. Vill. Of Corwall–on–Hudson Police Dep't, 577 F.3d 415, 429 (2d Cir.2009) (state-facilitated danger rule applies where the police "communicates, explicitly or implicitly, official sanction of private violence).

Thus, in Dwares, where the police gave skinheads prior assurances of non-interference with attacks on flag burning demonstrators, the Second Circuit held that such "prearranged official sanction of privately inflicted injury" violated the victims' due process rights.  985 F.2d at 99.  See also Hemphill v. Schott, 141 F.3d 412 (2d Cir.1998) (police handed a loaded gun to a crime victim who immediately shot his assailant while in police custody).  The Second Circuit extended and restated the state-facilitated danger theory in Peña v. DePrisco, holding that when

> state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct under Dwares.  This is so even though none of the defendants are alleged to have communicated the approval explicitly.

432 F.3d 98, 111-12 (2d Cir. 2005) (citations omitted).  The Second Circuit wisely recognized in Peña that "[s]ometimes deliberate silence is equivalent to explicit permission."  Id.

Here, the Officer Defendants' overt acts as well as their repeated and open omissions, repeatedly communicated to Tormentors that they would not be arrested, punished, or otherwise interfered with while engaging in misconduct likely to endanger Plaintiff's life, liberty and property.  Pursuant to the state-facilitated danger rule, the Officer Defendants are as liable for pointing Tormentors at Plaintiff as they would be for pointing a gun at her.

Further, under the selective withdrawal of police protection and state-facilitated danger rules, any Officer Doe defendant acting in a supervisory position is also liable under § 1983 for breaching their affirmative duty to intervene to protect Plaintiff's constitutional rights from infringement by other police officers in their presence.  See, e.g., Tompkins v. City of New

York, 50 F. Supp. 3d 426, 434 (S.D.N.Y. 2014), quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir.1994) and citing Colon v. Coughlin, 58 F.3d 865, 871 (2d Cir.1995).

**B.     42 U.S.C. Claims against The City of New York.**

To establish the City's liability for the Officer Defendants' conduct, Plaintiff must demonstrate that the City's official policy or custom inflicted the injury upon Plaintiff.  See, e.g., Sforza v. City of New York, No. 07CIV6122DLC, 2009 WL 857496, at *9 (S.D.N.Y. Mar. 31, 2009), citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).  To establish Monell liability, a plaintiff ordinarily must allege a pattern of violations, but a single violation can be sufficient if it was undertaken pursuant to an official policy or custom.  See, e.g., DiSorbo v. Hoy, 343 F.3d 172, 180–81 (2d Cir.2003); see also Mandell v. County of Suffolk, 316 F.3d 368, 385 (2d Cir.2003).  A plaintiff can demonstrate an official policy by showing "that a discriminatory practice of municipal officials was so 'persistent or widespread' as to constitute 'a custom or usage with the force of law,' or that a discriminatory practice of subordinate employees was 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'"  Carmichael, 34 F. Supp. 3d at 263, quoting Sorlucco v. New York City Police Dep't, 971 F.2d 864, 870–71 (2d Cir.1992).

Here, the NYPD's mistreatment of people based upon their gender identity and expression is systemic and pervasive as it is widely known and reported.  See, e.g., Complaint, Exhibit 1 to the Lopez Dec., ¶¶ 99-113.  See also, e.g., Exhibits 17 and 18 to the Lopez Dec. Plaintiff can therefore demonstrate the NYPD's policy of inflicting pain upon persons of trans experience by increasing their vulnerability to private parties.  For example, the widespread NYPD practice of chaining a person of trans experience to a wall in the standing position, or with their arms stretched uncomfortably over their head, or into some other structure in some other position, is intended to inflict pain and suffering upon the victim and to expose the victim

to violence from unrestrained arrestees and detainees with whom the victim is placed for the purpose of receiving such abuse or violence.  Plaintiff has demonstrated also the NYPD's policy of failing to take criminal complaints from persons of trans experience, not in the exercise of discretion but in furtherance of hateful discrimination.  Indeed, the NYPD repeatedly has abused Plaintiff by denying her equal protection of law and has done so to other persons of trans experience, too.  See, e.g., Complaint in *White v City of New York et al.*, SDNY 15-cv-6696 (GHW/jlc), Exhibit 19 to the Lopez Dec.

The City's official custom or policy with respect to the NYPD's treatment of persons of trans experience is to refuse to take or file criminal complaints relating to violence against people of trans experience, to refuse to intervene to stop or abate crimes against persons of trans experience even when witnessed by NYPD officers, to investigate complaints of violence against persons of trans experience in a manner designed to frustrate the arrest or prosecution of the offenders, and to allow officers to violate the civil rights of persons of trans experience by denying them police protection otherwise available in the community or, worse, to inflict pain and suffering upon them directly or through an agent of the NYPD's choosing.  That policy was the driving force behind Plaintiff's injury and the City is liable for the Officer Defendants' violations of Plaintiff's constitutional rights.

## IV.     THE BALANCE OF EQUITIES COMPELS INJUNCTIVE RELIEF, WHICH RELIEF ADVANCES A STRONG PUBLIC INTEREST.

The burden to Plaintiff of continued unconstitutional abuse is incalculable and the Defendants cannot advance any legitimate, countervailing state interest in continuing that abuse. Further, issuing the requested injunction will advance the public interest by protecting the constitutional rights of all its members.  See, e.g., Ligon, 925 F. Supp. 2d at 541.

Accordingly, Plaintiff's irreparable injury is both proven and presumed, she is substantially likely to succeed on the merits of her § 1983 claims against Defendants, and both

the balance of the equities and the public interest strongly favor the issuance of injunctive relief. Plaintiff's Injunction Motion should be granted in its entirety.

## V.   PLAINTIFF'S STATE-LAW CLAIMS INDEPENDENTLY ENTITLE HER TO INJUNCTIVE RELIEF.

As set forth above, Plaintiff is substantially likely to succeed on his merits of her § 1983. For the purposes of Plaintiff's Injunction Motion, however, it is sufficient merely for this Court to hold that Plaintiff states a claim under § 1983 sufficient to invoke the Court's supplemental jurisdiction over Plaintiff's state-law claims, which independently entitle Plaintiff to the injunctive relief requested.

### A.   New York City Human Rights Law

Title 8 of the Administrative Code of the City of New York (the "City HRL") is crafted to provide broader protection for human and civil rights than corresponding state or federal law. See, e.g., Levin v. Yeshiva Univ., 96 N.Y.2d 484, 489, 754 N.E.2d 1099, 1101 (2001).  Indeed, the statute expressly provides that it "shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." City HRL § 8–130.

The HRL defines gender to "include actual or perceived sex and shall also include a person's gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth."  City HRL § 8-102(23). A hate crime is defined as "a crime that manifests evidence of prejudice based on race, religion, ethnicity, disability, sexual orientation, national origin, age, gender, or alienage or citizenship status."  Id. at § 8-102(22).

The City in 2002 amended the City HRL to protect individuals from discrimination based on their gender and gender identity.  In doing so, the City's legislative body found that:

> In the city of New York, with its great cosmopolitan population, there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences, including those based on . . . gender . . . bias-related violence or harassment and disorder occasioned thereby threaten the rights and proper privileges of its inhabitants and menace the institutions and foundation of a free democratic state.

City HRL § 8-101.  The City HRL declares it an unlawful discriminatory practice, among other acts, to discriminate in the provision of housing or "for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section." Id. at § 8-107(19).

The City HRL provides a for compensatory and injunctive relief,

> Whenever a person interferes by threats, intimidation or coercion or attempts to interfere by threats, intimidation or coercion with the exercise or enjoyment by any person of rights secured by the constitution or laws of the United States, the constitution or laws of this state, or local law of the city and such interference or attempted interference is motivated in whole or in part by the victim's actual or perceived race, creed, color, national origin, gender, sexual orientation, age, whether children are, may or would be residing with such victim, marital status, partnership status, disability, or alienage or citizenship status as defined in chapter one of this title . . .

City HRL § 8-602.

The City HRL also provides a private right of action for victims of unlawful discriminatory practice:

> any person claiming to be aggrieved by an unlawful discriminatory practice as defined in chapter one of this title or by an act of

> discriminatory harassment or violence as set forth in [§ 8-602] shall have a cause of action in any court of competent jurisdiction for damages, including punitive damages, <u>and for injunctive relief</u> and such other remedies as may be appropriate . . ."

<u>Id</u>. at § 8-502 (emphasis added).

**B.    New York State Civil Rights Law**

The New York State Civil Rights Law provides, in relevant part, that gender "means a person's actual or perceived sex and shall include a person's gender identity or expression."  N.Y. Civ. Rights Law § 79-n (1)(d).  That statute further provides that,

> Any person who intentionally selects a person or property for harm . . . in whole or in substantial part because of a belief or perception regarding the . . . gender . . . of a person, regardless of whether the belief or perception is correct, shall be liable . . . for injunctive relief, damages, or any other appropriate relief in law or equity. . . <u>an injunction may be issued by such court or justice, enjoining and restraining any further violation, without requiring proof that any person has, in fact, been injured or damaged thereby</u>.

<u>Id</u>. (emphasis added).

## <u>CONCLUSION</u>

For all of the foregoing reasons, and for the reasons set forth in the Lopez Declaration and the Complaint, the Court should grant Plaintiff's motion for a preliminary injunction and award Plaintiff such other and further relief as is just and proper.

Dated: Bronx, New York
            September 11, 2015

LAW OFFICE OF DONALD R. DUNN, JR.

By: _____/S/_____
        Donald R. Dunn, Jr. (DD0069)

441 East 139th Street
Bronx, New York 10454
347-270-1863
Donald@drdunnlaw.com

Attorney for Plaintiff