UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------X
JENNIFER LOUISE LOPEZ,

               Plaintiff,

     - against -

CITY OF NEW YORK, NYPD OFFICERS
DOE1-20, CECIL HOUSING DEVELOPMENT
FUND CORPORATION, HOUSING AND
SERVICES, INC., and RALPH GARCIA,

               Defendants.
--------------------------------------X

**MEMORANDUM AND ORDER**
15 Civ. 7020 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


Plaintiff Jennifer Louise Lopez ("plaintiff") moves for a preliminary injunction in this action brought pursuant to, <u>inter alia</u>, 42 U.S.C. § 1983 ("§ 1983"), New York State Civil Rights Law § 79-n ("§ 79-n"), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 <u>et seq.</u> Plaintiff principally seeks an order directing defendant City of New York (the "City") to record and investigate in a non-discriminatory manner her criminal complaints against fellow tenants in her supportive housing project for formerly homeless adults whom she alleges have harassed and threatened her, and enjoining defendants Cecil Housing Development Fund Corporation ("CHDFC") and Housing and Services, Inc. ("HSI," and together with defendant Ralph Garcia, the "Cecil Defendants"), from discriminating on the basis

1

of her expression of her gender identity.  While the alleged behavior of certain of plaintiff's neighbors is reprehensible and in some circumstances possibly unlawful, she has not adequately shown that the City or Cecil Defendants are the appropriate parties against whom to impose liability.  We deny the motion.


## BACKGROUND

### I.   <u>Facts</u>

Except where noted, the following facts, drawn from the complaint filed September 12, 2015 (the "Complaint" or "Compl."), the Declaration of Jennifer Louise Lopez ("Lopez Decl.") and the exhibits attached thereto, the Declaration of HSI Director of Programs Kristi Kimmerle ("Kimmerle Decl.") and the exhibits attached thereto, and the briefs submitted in connection with the instant motion, are not in dispute for purposes of this motion. Plaintiff, a woman of trans experience, is a community activist who advocates for acceptance and integration of persons of trans experience.  In March 2013, she was offered a subsidized room in the Cecil Hotel (the "Cecil"), a single-room occupancy building operated by not-for-profit corporations HSI and CHDFC comprising 89 units and serving a population of the chronically homeless, in addition to the formerly incarcerated and individuals living with severe and persistent mental illness, HIV/AIDS, addiction, and developmental or physical disabilities.  Kimmerle Decl. ¶¶ 4-5.

According to its website, HSI provides access to "wide-ranging on-site services that are elective and customized" to target "root causes of homelessness." Compl. ¶ 58. Before committing to her lease, plaintiff was reassured by HSI's managerial agent that the Cecil would be a supportive environment where she could freely express her gender identity.

Plaintiff moved into the Cecil in April 2013, and within a few months, five of her neighbors began to subject her to harassment, intimidation, and other vulgar behavior. Specifically, in addition to referring to her as "he," "man," and "bastard," they yell and play loud music to wake her up before turning it down when Cecil security arrives; loudly accuse her of fouling the shared bathrooms, with explicit references to her genitalia and appearance; shout vulgar epithets at her; and threaten her with violence. Id. ¶¶ 48-51.

Plaintiff's submissions detail instances of her calling the police in response to these neighbors' conduct:

- In July 2013, a neighbor who had previously threatened to kill plaintiff propositioned her for sex. On both occasions the NYPD had responded to plaintiff's calls, but the on-site security guard Garcia[1] told responding officers that the issue would be addressed with the "Program Coordinator" the following day. The officers then told plaintiff that all complaints must be addressed to Cecil management. When plaintiff informed them that the neighbor had said he would kill her, one officer responded "that's not a crime." Compl. ¶ 60.

---

[1] As distinct from defendant and Cecil chief of security Ralph Garcia. See Compl. ¶ 55. We refer to the latter only by his full name.

- In January 2014, after her previous noise complaints had been ignored by Garcia, plaintiff took her concerns to an NYPD supervisor, who said he would send two officers to talk with two tenants she was complaining about.  As described by her as part of a contemporaneous "grievance" letter to Cecil management, when the officers, one male and one female, arrived, Garcia told the female officer that plaintiff was "always complaining" and that the complained-of "music is not loud." Lopez Decl., Ex. 8 at 2.  Garcia "continued to take sides between the tenant . . . and the [male officer] as he was letting the tenant know that the tenant could not be yelling from his room out into the hall and he could not have his music up really loud."  Id.  When Garcia attempted to say that the tenant could yell from his room, the male officer corrected Garcia, telling the tenant that he could not, "repeat[ing] himself several times."  Id.  Plaintiff mentioned that her second complaint concerned another tenant playing loud music with his door open, but Garcia told the officers that tenants were permitted to keep their doors open because certain "patients" required security to check on them, and that it was "a building management issue [and] not a police issue."  Id. at 2-3.  Turning to plaintiff, Garcia said she would need to learn to get along with her neighbors; the male officer said that plaintiff had to listen to Garcia.  Id. at 3.  Plaintiff wrote that Garcia had "represented herself to the police as an authoritative figure in the building," resulting in the officers discrediting plaintiff's statements and not talking to the second tenant, in addition to creating "credibility problems with the officers that had come and also possibly the supervisors" with whom she had "developed a positive interactive relationship."  Id.

- In December 2014, plaintiff went to the 28th Precinct and spoke to Officer Victor Pena, who, after listening to the details of her complaints against her neighbors and Cecil security guards, told her that police would be sent to speak to them.  Plaintiff thereafter recounted her conversation with Pena to Cecil's security chief Ralph Garcia, who told her that he was a retired NYPD lieutenant and "communicated that he would 'make a few calls' to assure that the NYPD did not respond" to her complaints.  Compl. ¶ 74.  According to plaintiff, Pena's promises of assistance did not materialize.

- In February 2015, plaintiff wrote a letter to Cecil management about security guard Garcia's "inappropriate behavior," noting that she had "submitted grievances about her in the past" and referring to an incident with the NYPD that day.  Lopez Decl., Ex. 11.  In addition to complaining about Garcia waking her up

4

by "walk[ing] in the halls loudly, whistling, singing and talking loudly to the residents," plaintiff wrote that Garcia "once again interfered as a referee attempting to side with the police[,] [t]hen further refereed [sic] to me as Ms. Jennifer Lopez, causing the police to laugh and not take me seriously." Id.   Plaintiff requested that Garcia's harassment and interference stop, and that Garcia be suspended or terminated.

- In April 2015, a neighbor yelled through plaintiff's door that he was going to be "very sorry" that he did not kill "him [plaintiff]," and that if she came out of her room "they going to take my ass to jail today." Compl. ¶ 61.   While NYPD officers responded to plaintiff's call, they left once Garcia told them that the "program" would take care of the issue, and they refused to take a complaint from plaintiff.   Plaintiff wrote to Cecil management concerning the incident, noting that Garcia had told an officer, "'This will all be dealt with when the program supervisor comes in on Monday[,]' [b]asically telling the police [they] did not need to do anything," and had said "this is 'a program[,]' [w]hich is a tactic used to get NYPD not to do anything." Lopez Decl., Ex. 12.   She again accused Garcia of attempting to "get the police not to take any action" when plaintiff had problems with her neighbors.   Id.

- In May 2015, plaintiff again went to the 28th Precinct to obtain assistance.   She met with the Precinct's commanding officer, Deputy Inspector Obe, and explained in detail the nature of her complaints against her neighbors, Cecil management and security, and NYPD officers who had refused to record her complaints over the past two years.   Obe said that her concerns would be addressed and that he would personally speak with her neighbors and Cecil management.   At that meeting, the NYPD filed a criminal complaint from plaintiff against one Cecil tenant. "Thereafter, however, the NYPD did not arrest, interview or otherwise restrain that person" or anyone else in connection with the complaint.   Compl. ¶¶ 77-79.

More generally, plaintiff states that despite her calling for police help "dozens of times," the NYPD has repeatedly refused to record her complaint, with the exception of the May 2015 complaint.

<u>Id.</u> ¶ 66.[2]  She asserts that the neighbors' conduct and the NYPD's response generally follow a similar pattern, in which the neighbors' harassment continues unabated until it escalates to threats of physical or sexual violence, compelling her to call 911; Cecil security guards tell the arriving police officers that the "program director" will take care of the issue the next day, or that the complaints are "all part of the program"; and the officers tell her that she must address her complaints to Cecil management and cannot file a complaint with the NYPD.  <u>Id.</u> ¶¶ 57, 59.  In addition, she alleges that security guard Garcia frequently referred to her "dismissively as 'Jennifer Lopez' or 'J Lo' to the NYPD's various responding officers, almost always eliciting a smile or chuckle."  <u>Id.</u> ¶ 46.  Plaintiff has adopted a nocturnal schedule to avoid those neighbors who harass her, begun to drink to sleep, and has been worn down physically and mentally to the point where she contemplates suicide.

In August 2015, while suffering a "hateful diatribe, Plaintiff struck one of her Tormentors in the face as he came close enough to physically intimidate her," and "[a]nother Tormentor

---

[2] Apart from incidents in which plaintiff contacted the NYPD, her correspondence with Cecil management indicates that she had often complained about the behavior of other tenants and expressed her belief that Cecil employees, in particular Garcia, were not taking her concerns seriously.  <u>See</u> Lopez Decl., Exs. 6-10. Her complaints about tenants related to their TV/music volume, their yelling in their rooms, sometimes at her, and their directing vulgar language at her, including one tenant calling her a man and telling her to "Go suck your dick," <u>id.</u> Ex. 10.  She also wrote management concerning cigarette smoke in the hallway exacerbating her asthma and pests in her apartment.  <u>See</u> <u>id.</u> Exs. 8-9.

grabbed Plaintiff and dragged her roughly down the hall before she escaped his grasp and left the building to get away." Id. ¶ 80. Cecil management coordinated with the NYPD to effect plaintiff's arrest later that day at her apartment; the NYPD arrested only her and did not file a complaint from her.  Management informed her that house rules required tenants to refrain from disturbing their neighbors and that she no longer qualified for services previously provided to her and otherwise available to residents.   However, following this action's commencement, HSI offered plaintiff both in-house psychiatric services and referrals to outside psychiatric services, and plaintiff confirms that any issue of "cancelled" psychiatric services has been resolved, see Pl. Reply at 4.[3]

## II.   **Procedural Background**

On September 4, 2015, plaintiff commenced this action, bringing § 1983 claims against all defendants for violations of her equal protection and due process rights and claims under state and local law against the Cecil Defendants.[4]  Proceeding initially through an order to show cause, she has moved for a preliminary

---

[3] The Cecil Defendants dispute that psychiatric services were ever withheld from plaintiff, noting that she was provided on-site psychiatric services from April 2014 to September 2015 as a courtesy despite not being entitled to such services as a "community referral" tenant, and that on multiple occasions she failed to attend scheduled appointments or refused psychiatric services when offered. See Kimmerle Decl. ¶¶ 6-12.

[4] According to the Cecil Defendants, prior to HSI being served in this action, plaintiff was served with papers on September 11, 2015, related to state court nonpayment proceedings.  HSI notes that while its usual policy is to initiate such proceedings after two months without receiving rent, it waited four months before doing so against plaintiff.  See Kimmerle Decl. ¶¶ 16-17.

injunction, requesting that we enjoin the City from engaging in any further discriminatory conduct against her based on her expression of her gender identity; direct the City to take and file her "complete criminal complaints against those of her neighbors who have victimized [her] with criminal acts" and to investigate her complaints in a non-discriminatory manner; enjoin HSI/CHDFC from engaging in discriminatory conduct against her and excluding her from social services offered at the Cecil; and enjoin HSI/CHDFC from terminating or otherwise interfering with her tenancy.[5]  Order to Show Cause, ECF No. 8 at 1-2.  The case was assigned to this Court on September 21, and after a conference on September 24, the parties conferred and agreed on a non-expedited briefing schedule.  The motion was fully briefed on December 9.

## DISCUSSION

### I.   Preliminary Injunction Standard

In order to obtain the extraordinary remedy of a preliminary injunction, the moving party must generally establish: "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits

---

[5] The Cecil Defendants devote much briefing to this last form of relief, contending that we lack jurisdiction to enjoin state court nonpayment proceedings.  Plaintiff does not specifically address this relief in her briefs, stating only that those proceedings are "not the subject of [her] request for injunctive relief," Pl. Reply at 4.  We thus do not address them either.

to make them a fair ground for trial, with a balance of hardships tipping decidedly in the [movant's] favor; and (3) that the public's interest weighs in favor of granting an injunction," <u>Red Earth LLC v. United States</u>, 657 F.3d 138, 143 (2d Cir. 2011) (internal quotation marks omitted).  "The burden is even higher on a party . . . seek[ing] a mandatory preliminary injunction that alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo." <u>Cacchillo v. Insmed, Inc.</u>, 638 F.3d 401, 406 (2d Cir. 2011) (internal quotation marks omitted).  The former should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." <u>Id.</u> (internal quotation marks omitted).  While plaintiff incorporates this more demanding standard, she arguably seeks a combination of mandatory and prohibitory injunctive relief:  an order directing the NYPD to record her criminal complaint and to conduct an unbiased investigation into her alleged harassers, but also prohibiting future discriminatory conduct and preventing the Cecil Defendants from interfering with her attempts to obtain police assistance. Because she does not meet either standard, we need not distinguish our analysis based on the relief sought.

## II.  <u>Irreparable Harm</u>

The single most important consideration for the issuance of

a preliminary injunction is a showing of probable irreparable harm:
the movant must show that her alleged injury is likely and
imminent, not remote or speculative, and that the injury cannot be
fully remedied by monetary damages.  Reuters Ltd. v. United Press
Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990).   As a general
matter, irreparable harm is presumed when there is an alleged
deprivation of constitutional rights.  Donohue v. Mangano, 886 F.
Supp. 2d 126, 150 (E.D.N.Y. 2012).  However, the "assertion of a
constitutional injury is insufficient to automatically trigger a
finding of irreparable harm," and thus we "cannot determine whether
the constitutional deprivation is convincingly shown without
assessing the likelihood of success on the merits."  Id.

### III. **Claims Against the City**

Recognizing that a "State's failure to protect an individual
against private violence simply does not constitute a violation of
the Due Process Clause," DeShaney v. Winnebago County Dep't of
Soc. Servs., 489 U.S. 189, 197 (1989), plaintiff instead challenges
the NYPD's failure to adequately investigate her claims as (i) an
equal protection violation based on her gender identity, and (ii)
a due process violation under the state-created danger exception
to DeShaney's general rule.

#### A.  Equal Protection

"While the Constitution provides individuals with no
affirmative right to an investigation of their claims by the

10

government, it does prohibit the government from treating individuals unequally when determining which claims to investigate." Troy v. City of New York, No. 13-CV-5082 (AJN), 2014 WL 4804479, at *10 n.3 (S.D.N.Y. Sept. 25, 2014), aff'd, 614 F. App'x 32 (2d Cir. 2015); see DeShaney, 489 U.S. at 197 n.3 (State may not "selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause"). Plaintiff and the City agree that to establish an equal protection violation, she must show that (1) "compared with others similarly situated, [she was] selectively treated," and (2) "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations," Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F. Supp. 2d 679, 692 (S.D.N.Y. 2011) (quoting Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995)).[6] While plaintiff and the City disagree on the level of scrutiny to apply to any disparity in treatment, we need not resolve that dispute because plaintiff has failed to sufficiently show purposeful discrimination.

In arguing that she was "treated differently from similarly

---

[6] Plaintiff cites, without elaboration, Pyke v. Cuomo, 258 F.3d 107, 109-10 (2d Cir. 2001), in which the Second Circuit, considering claims of race-based denial of police protection, held that a plaintiff "alleg[ing] that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner . . . is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection." Even if she did not agree that comparators were required and assuming Pyke applied here, plaintiff would still need to show that the NYPD's actions were motivated by discrimination, which she has not, see infra.

situated persons in several material respects," plaintiff relies solely on provisions in the NYPD Patrol Guide which she claims create a "non-discretionary duty" on the part of NYPD officers "to accept all criminal complaints." Pl. Mem. at 16. However, "[i]n police failure-to-serve cases, the courts consistently have required more evidence of discriminatory intent than a simple failure of diligence, perception, or persistence in a single case involving minority victims." Carmichael v. City of New York, 34 F. Supp. 3d 252, 262 (E.D.N.Y. 2014) (internal quotation marks omitted); see id. (collecting cases).

Accordingly, the Patrol Guide, an internal manual containing rules, procedures and policies adopted for the "governance, discipline, administration and guidance of the Police Department," Galapo v. City of New York, 95 N.Y.2d 568, 574-75, 744 N.E.2d 685, 688 (2000), does not, standing alone, support the conclusion plaintiff asks us to draw.[7] To begin, the sections excerpted by plaintiff lack clear language indicating that a responding officer retains no discretion to determine whether a particular situation merits recording a formal complaint.[8] As the City points out,

---

[7] Section 1983 is not a remedy for violations of the NYPD Patrol Guide. See Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2006) (violation of police regulations does not in itself establish constitutional violation); see also Galapo, 95 N.Y.2d at 575, 744 N.E.2d at 688 (the Patrol Guide "is not a body of law or regulation establishing clear legal duties that should serve as a basis for civil liability of municipalities").

[8] For example, the "Complaint Reporting System" section defines "Complaint" as an "allegation of an unlawful or improper act or omission, or other condition

12

"the duty to investigate criminal acts (or possible criminal acts) almost always involves a significant level of law enforcement discretion," Harrington v. County of Suffolk, 607 F.3d 31, 35 (2d Cir. 2010).

More importantly, besides for her unsupported assertion that the Patrol Guide would not only require but would in fact result in officers recording a complaint in similar circumstances, plaintiff neither alleges nor provides evidence that the NYPD's treatment of her was different from that of similarly situated individuals.  Plaintiff does not attempt to prove that the NYPD would respond to comparable calls from non-trans experience persons concerning noise, harassment, or verbal threats by recording complaints or conducting more thorough investigations, and therefore she has not shown selective treatment.  See Carmichael, 34 F. Supp. 3d at 263-68 (granting City summary judgment where plaintiff did not produce evidence sufficient to show that NYPD had a practice of failing to conduct immediate searches for African-Americans reported as missing, in contrast to

_____

that necessitates investigation to determine if any unlawful act or omission occurred," but provides no explicit instructions on when one must be recorded:

> [p]roper complaint reporting is essential for statistical analysis, discovery of crime patterns and trends, efficient deployment of resources, and uniform crime reporting.  Every member of the service involved in this process has a responsibility and obligation to ensure the integrity of this vital, strategic resource.

Patrol Guide Procedure 207-01 (eff. Aug. 19, 2013), Lopez Decl., Ex. 14 at 1.

its treatment of white persons reported as missing, or that plaintiff's race motivated her treatment); Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 438-39 (2d Cir. 2009) (rejecting argument that "repeated deviations from the mandatory arrest statute and from corresponding police department policy" with respect to one female domestic violence victim could be grounds for an inference of gender bias).

Nor does plaintiff show that any treatment was motivated by discriminatory intent.  Her only specific allegation on this front is that NYPD officers "almost always" reacted to Garcia calling her "Jennifer Lopez" or "J Lo" by "smil[ing] or chuckl[ing]," Compl. ¶ 46.  Even if the officers' reactions plausibly reflect poor taste or perhaps prejudice, we do not think the reactions alone are sufficient to infer that the officers' conduct in these circumstances was motivated by discriminatory animus.  Indeed, relying on such reactions is particularly difficult where plaintiff's Complaint and contemporaneous writings to Cecil management evidence her belief that the officers' decisions not to pursue an investigation further were animated by Cecil employees' representations that any problems would be addressed internally as part of a program.  See Compl. ¶¶ 57-59; Lopez Decl., Ex. 8 at 3 (letter asserting that Garcia's representation of herself as "authoritative figure in the building" led to police discrediting plaintiff's statements); id. Ex. 12 (letter claiming Garcia used

misleading references to "program" as "tactic" to get "NYPD not to do anything"). In sum, the absence of evidence of similarly-situated persons treated differently or of plaintiff's gender expression motivating the officers' conduct precludes injunctive relief.

B. <u>State-Created Danger</u>

State actors can be liable for substantive due process violations under the state-created danger doctrine for "affirmative act[s] that create[] an opportunity for a third party to harm a victim (or increase[] the risk of such harm)." <u>Lombardi v. Whitman</u>, 485 F.3d 73, 80 (2d Cir. 2007). Thus, as relevant here, police officers may infringe a victim's rights where the officers "communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others." <u>Pena v. DePrisco</u>, 432 F.3d 98, 111 (2d Cir. 2005); <u>see</u> <u>Dwares v. City of New York</u>, 985 F.2d 94, 99 (2d Cir. 1993) (distinguishing between officers "fail[ing] to act upon reports of past violence" and "officers in some way . . . assist[ing] in creating or increasing the danger to the victim"). The doctrine reaches not only express sanction of private violence, <u>see</u> <u>id.</u> (reinstating due process claims where police assured skinheads that unless they got totally out of control, they would not be prevented from beating up protestors), but also implicit

15

condoning of such violence.  For example, officers could be found to have "affirmatively encouraged . . . domestic violence" where they discussed football with a suspect who allegedly beat and choked his girlfriend, were dismissive of the victim in front of the suspect, declined to arrest him despite his admission that "he could not 'help it sometimes when he smacks [her] around,'" and responded to several similar complaints without filing an incident report or interviewing the suspect.  Okin, 577 F.3d at 429-30.  In each case in this line of the state-created danger doctrine, however, officers explicitly or implicitly communicated to the perpetrators that their "actions were acceptable, or, at least, would go unpunished."  Bunn v. City of Poughkeepsie, No. 10 CIV. 2297 (PAE), 2012 WL 1621563, at *5 (S.D.N.Y. May 9, 2012).

Here, while plaintiff asserts generally that her neighbors escalated their abuse when they saw her requests for police help go unanswered or result in officers dismissing or ridiculing her, there is a paucity of evidence to support that contention.  There is limited evidence of officers actually interacting with the neighbors: plaintiff does contend that officers treated her with "disdain or even contempt," laughed or smiled at Garcia's "J Lo" references, and refused to record her complaints, Compl. ¶¶ 5, 46, and indicates that this occurred in front of neighbors, see id. ¶ 92 (alleging "continued and public inaction" and "public encouragement" of neighbors "by laughing and smiling" at jokes).

16

Viewed in context, however, these allegations do not suggest that police communicated to the neighbors that the officers were unlikely to intervene if the misconduct intensified.   Officers responded to each of plaintiff's calls for assistance, see id. ¶ 5, and the only detailed contemporaneous evidence of interaction between NYPD and any neighbor is of an officer attempting to dissuade an alleged harasser from engaging in some of the complained-of misconduct: plaintiff's January 2014 letter to Cecil management indicates that officers sent at her request to talk to two Cecil tenants instructed one of them not to yell into the hall and not to play very loud music, see Lopez Decl., Ex. 8 at 2-3. The limited information available here does not reveal police conduct likely to embolden the neighbors in harassing or threatening plaintiff.

Further, plaintiff devotes no space in her brief to addressing a necessary requirement for establishing a substantive due process violation: whether the state action in question is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).   Intentionally inflicted injuries are most likely to rise to that level, whereas "negligently inflicted harm is categorically beneath the threshold of constitutional due process"; in between is the context-specific "closer call[]" of recklessness.   Id. at 848-49.   Liability based on such "deliberate

17

indifference" requires "proof that the defendant focused upon the risk of unconstitutional conduct and deliberately assumed or acquiesced in such risk." _Pena_, 432 F.3d at 114 (internal quotation marks omitted); _see id._ (alleged behavior conscience shocking where it took place "over an extended period of time and in the face of action that presented an obvious risk of severe consequences and extreme danger"); _Okin_, 577 F.3d at 431-32 (officers' actions demonstrated "willful disregard" of serious and obvious risks of domestic violence situation).

Here, there is no evidence of intentional injury, and the allegations regarding interactions between NYPD officers and plaintiff or her neighbors do little to suggest that the officers were presented with an obvious risk of danger or were aware of any likelihood that their failure to investigate further would enhance such risk. While plaintiff apparently communicated her neighbors' threats of violence to police, she also called them to resolve noise disputes, _see_ Lopez Decl., Exs. 8, 13, from which the officers would not infer a risk of serious impending harm. Moreover, whether or not it was appropriate to allegedly stop investigating when told that complaints about fellow Cecil tenants were to be addressed through a special program, those representations made it less likely that the officers would draw the inference that she was in danger. In light of all of the

above, plaintiff's motion on her due process claim is denied.[9]

## IV.  Claims against the Cecil Defendants

Plaintiff moves for a preliminary injunction against the Cecil Defendants on her claims pursuant to § 1983, the NYCHRL, and § 79-n.  She has not demonstrated a likelihood of success or substantial questions with respect to the merits of these claims.

As for her § 1983 claims, the actions of private parties may be deemed state action only if "there is a sufficiently close nexus between the State and the challenged action of the . . . entity so that the action of the latter may be fairly treated as that of the State itself," Am. Mfrs. Mut. Ins. v. Sullivan, 526 U.S. 40, 52 (1999) (internal quotation marks omitted).  Accordingly, state action may be established where:

> the state exercises "coercive power" over, is "entwined in [the] management or control" of, or provides "significant encouragement, either overt or covert" to, a private actor, or where the private actor "operates as a willful participant in joint activity with the State or its agents," is "controlled by an agency of the State," has been delegated a "public function" by the state, or is "entwined with governmental policies."

Tancredi v. Metro. Life Ins., 316 F.3d 308, 313 (2d Cir. 2003) (alteration in Tancredi) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 296 (2001)).

---

[9] Because plaintiff has not demonstrated a likelihood of success or substantial merits questions as to her asserted constitutional violations, we do not address the City's municipal liability.  See Matican v. City of New York, 524 F.3d 151, 154 (2d Cir. 2008).

Plaintiff asserts that the Cecil Defendants acted under color of state law because they colluded with NYPD officers and acted "pursuant to the police-power authority apparently and openly granted" to them.  Pl. Mem. at 15.

While the Cecil Defendants ignore these assertions, responding only that the receipt of public funding does not convert them into state actors, we nonetheless find plaintiff's theories of state action unavailing at this stage.  With respect to her collusion theory, "[a] private actor can only be a willful participant in joint activity with the State or its agents if the two share some common goal to violate the plaintiff's rights," Betts v. Shearman, 751 F.3d 78, 85 (2d Cir. 2014) (internal quotation marks omitted), and, given the above discussion of her equal protection and due process claims against the City, plaintiff has not shown that NYPD officers responding to her calls shared such a goal.  Further, any supposition of joint action is belied by her contentions that Cecil employees "falsely represented" to the officers that her "dispute is part of a special 'program' [and] would be addressed . . . by the 'program coordinator,'" Pl. Reply at 2; see Lopez Decl., Ex. 12 (plaintiff's letter to management contending that "actions of Cecil staff have caused some of the police to think that this building is a 'program' and that matters

are dealt with by staff at the Cecil").[10]  With respect to her delegation-of-police-power theory, plaintiff appears to be implicating the "public function" test, but provides no analysis or support for her argument that private security personnel performed an exclusively public function delegated to them by the state because they assured responding officers that complaints would be resolved internally and the officers left.  Cf. Romanski v. Detroit Entm't, L.L.C., 428 F.3d 629, 637 (6th Cir. 2005) ("Where private security guards are endowed by law with plenary police powers such that they are de facto police officers, they may qualify as state actors under the public function test." (some emphases added)).  Cecil guards were not authorized to carry out all of the NYPD's investigative functions simply because NYPD officers, who came to the Cecil and conducted at least some inquiries in response to her calls, decided not to take further action once made aware that the Cecil apparently intended to resolve certain complaints of non-violent behavior internally.  Absent colorable arguments that the Cecil Defendants acted under color of state law, plaintiff is not entitled to injunctive relief on her § 1983 claims against them.

---

[10] Plaintiff also relies on her allegation that in December 2014, Ralph Garcia told her that he was a retired NYPD lieutenant and would "make a few calls" to ensure that NYPD did not respond to her complaints, Compl. ¶¶ 73-76, but there is no evidence that he was motivated by discriminatory animus so as to support an equal protection claim, or that his statement was communicated to her neighbors so as to support a state-created danger claim.  Further, NYPD did respond when plaintiff called for help after December 2014.  See id. ¶¶ 61-63.

As for her § 79-n claim, plaintiff is correct that this relatively new civil cause of action for "[b]ias-related violence or intimidation" applies to those intentionally selected or harmed because of a "belief or perception" regarding their, inter alia, gender identity or expression.  N.Y. Civ. Rights Law § 79-n(1)(d), (2).  However, she cites no authority indicating that the remedy is applicable absent allegations that the Cecil Defendants themselves engaged in acts of violence or intimidation directed at her.  Indeed, the legislative history suggests otherwise.  See N.Y. State Assembly Mem. in Support, Bill Jacket, 2010 A.B. 529, ch. 227, at 4 (bill would "provide the vehicle necessary for someone to initiate a civil action against a perpetrator of bias-related violence or intimidation"); Governor's Approval Mem., Bill Jacket, 2010 A.B. 529, ch. 227, at 3 ("new remedy applies only to 'bias-related violence or intimidation'" (emphases in original)).

Finally, the Complaint does not identify a particular NYCHRL provision that the Cecil Defendants violated, but in her brief plaintiff cites New York City Administrative Code § 8-107(19), which makes it unlawful "for any person to coerce, intimidate, threaten or interfere with . . . any person in the exercise or enjoyment of . . . any right granted or protected pursuant to [§ 8-107]," or to attempt to do so.  However, she neither specifies the relevant right protected by § 8-107 that the Cecil Defendants allegedly invaded nor provides any justification for the

provision's application here.   Plaintiff does make a passing reference to the NYCHRL's prohibition on discrimination in connection with housing accommodations, see Pl. Mem. at 22, but prior to any development on this issue, we have no reason to conclude that plaintiff's interest in initiating criminal investigations against her neighbors is one of "the terms, conditions or privileges" of the "lease" or the "facilities or services" furnished in connection therewith so as to be actionable under § 8-107(5)(a)(2).   Accordingly, we deny plaintiff's motion on her NYCHRL claims as well.[11]

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction is denied.   The Court will contact the parties shortly to schedule a conference in this action.

**SO ORDERED.**

Dated:   New York, New York
        May _12_, 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[11] Plaintiff's brief also cites to New York City Administrative Code § 8-602, which provides a civil action, enforceable by private citizens through § 8-502, to "enjoin discriminatory harassment or violence," N.Y.C. Admin. Code § 8-602. § 8-602 applies where a person "interferes" or attempts to "interfere by threats, intimidation or coercion with the exercise or enjoyment by any person of rights" secured by federal, state, or local law and "such interference or attempted interference is motivated in whole or in part" by certain of the victim's actual or perceived characteristics, including gender.   Id. Plaintiff, whose motion focuses on the intimidation and threats she has been subjected to by her neighbors, does not advance any argument as to specific acts of the Cecil Defendants that threatened, intimidated, or coerced her so as to interfere with her exercise or enjoyment of any particular right.