UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JENNIFER LOUISE LOPEZ,                              :     ECF Case
                                                    :
                            Plaintiff,              :
                                                    :     Case No.: 15-cv-7020 (NRB/rjm)
            -against-                               :
                                                    :
THE CITY OF NEW YORK, NYPD OFFICERS                 :
DOE1-20, CECIL HOUSING DEVELOPMENT                  :     **<u>AMENDED COMPLAINT</u>**
FUND CORPORATION, HOUSING AND                       :
SERVICES, INC., and RALPH GARCIA,                   :
                                                    :     **PLAINTIFF DEMANDS
                            Defendants.             :     <u>TRIAL BY JURY</u>**
                                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff, Jennifer Louise Lopez ("Plaintiff"), alleges as her Amended Complaint the

following:

       1.     Plaintiff is a woman of trans experience.  Her journey typifies that of other people

who, like Plaintiff, courageously decided to take responsibility for their life with their actions

and to live openly according to the dictates of their conscience.  For Plaintiff, that means to be

and live as a woman.  After Plaintiff came out in the fall of 2012, Plaintiff's family severed their

ties with her.  Within a few months she was homeless, as are one in five persons of trans

experience at some point in their lives, and sleeping on New York City subway cars.

       2.     Finally, in April 2013, Plaintiff moved into a room at the Cecil Hotel, a publicly-

funded, SRO housing project that comprises twenty-four rooms, two communal kitchens and ten

shared bathrooms per floor.  Cecil Hotel purports to provide safe, permanent housing for at risk

persons such as Plaintiff and to provide a panoply of social services to support tenants.

       3.     Within three months of moving into the Cecil Hotel, five of Plaintiff's neighbors

(her "Tormentors") had mounted a full-time campaign of harassment, intimidation and other

criminal and vulgar behavior directed at Plaintiff solely because she is a person of trans

experience.  Tormentors' behavior includes daily epithets, intentional disruption of Plaintiff's sleep, threats of physical violence, and physical intimidation such as being punched.

4.      For more than two years, the Cecil Hotel's owner and managing agent, defendants Cecil Housing Development Corporation, Inc. ("Cecil HDFC") and Housing and Services, Inc. ("Housing Inc.") (collectively, the "Owner"), have refused to intervene on Plaintiff's behalf or even to enforce their own house rules that protect Plaintiff from such abuse.  To the contrary, Owner's security officers taunt Plaintiff and threaten her with retribution for complaining.

5.      Plaintiff has called for the NYPD's help dozens of times.  The responding officers treat Plaintiff with disdain or even contempt, refuse to render any assistance to Plaintiff, and refuse to file a criminal complaint from her, all in the presence of Plaintiff's Tormentors.

6.      When Plaintiff prevailed upon responding officers to at least take a criminal complaint from her, for example by playing audio recordings of offensive or threatening behavior by the Tormentors, Owner's representatives falsely told the responding officers that any dispute between residents of the Cecil Hotel are to be resolved by an unspecified "program coordinator" pursuant to an unspecified "program."  The responding officers then delegated all authority and jurisdiction over Plaintiff's complaints to Owner and its agents.

7.      When Plaintiff appealed to the NYPD 28th Precinct's command structure, she was promised that she would be afforded equal protection.  Instead, the NYPD did nothing.  Defendant Ralph Garcia, Owner's chief of security and a retired NYPD lieutenant, later said he "made a few calls" to his friends at the NYPD and that the NYPD would not respond to Plaintiff's complaints and calls for help.

8.      Owner has colluded with the NYPD to deny Plaintiff her due process and equal protection rights in an ongoing pattern of abuse.  For example, in January, 2016, Owner directed

2

NYPD officers to forcibly remove Plaintiff from her home in the middle of the night and take Plaintiff to a hospital to be evaluated for involuntary, psychiatric confinement.  Plaintiff was released in less than an hour and told by the medical staff that Plaintiff never should have been brought in by the NYPD.  The very next night, Owner again summoned NYPD officers to take Plaintiff for a psychiatric evaluation.

9.     As a further example, in June 2016, when Plaintiff was again attacked by one of her Tormentors and called the police for help, Owner directed the NYPD officers to take a complaint from the Tormentor, not from Plaintiff, and to arrest only Plaintiff.  The responding officers complied with that direction.

10.     Just today, the NYPD served Plaintiff with an order of protection relating to that June 2016 arrest.  That order of protection prohibits Plaintiff from entering or approaching the building where she lives, forcing Plaintiff to choose between being homeless or being arrested for going home.  As of the filing of this Amended Complaint, shortly after midnight, Plaintiff has nowhere to sleep where she can avoid the thunderstorms forecast for tonight.  Plaintiff plans to drink enough alcohol to sleep and to spend the night in the South Ferry station or on the subway.

11.     Accordingly, Plaintiff seeks injunctive relief and compensatory and punitive damages, pursuant to 42 U.S.C. § 1983 for violations Plaintiff's equal protection and due process rights, and pursuant to the laws of the State and City of New York.

## THE PARTIES

12.     Plaintiff Jennifer Louise Lopez is a natural person who resides and is domiciled in the State, County and City of New York.  Plaintiff is a community activist who advocates for acceptance and integration of persons of trans experience.

13.     Defendant The City of New York ("City") is a municipal corporation duly organized and existing under the laws of the State of New York.  The City can be served with process care of Corporation Counsel, 100 Church Street, New York, New York.

14.     As set forth below in greater detail, the acts and omissions complained of were perpetrated by the NYPD, the agency of the City of New York responsible for law enforcement, and several of the NYPD's officers acting further to and consistent with the official custom or policy of the City.  Pursuant to the New York City Charter, however, all actions or proceedings for the violation of any law must be brought in the name of the City of New York, not its agencies.  The NYPD therefore is not a party to this action.

15.     Defendants NYPD Officers Doe1-20 (collectively, the "Officer Defendants"), being fictitious names, are each employed by the City as an NYPD officer.  The full names, ranks and true identities of Officers Doe1-20 are unknown to Plaintiff without discovery but are persons who are liable to Plaintiff either for violating her constitutional rights by failing to accept from her a criminal complaint or by failing to intervene when a subordinate officer did so with their knowledge, as set forth below in detail sufficient to identify them to the City.

16.     The domiciles of Officer Defendants are unknown to Plaintiff without discovery. However, all Officer Defendants are domiciled in the State of New York, as required by the New York State Public Officers Law, in either the City of New York or a surrounding county.

17.     Defendant Cecil Housing Development Corporation, Inc. ("Cecil HDFC") is a not-for-profit corporation duly organized and existing under the laws of the State of New York and having its principal place of business c/o defendant Housing & Services, Inc., Attn.: James Dill, 461 Park Avenue South, 6th Floor, New York, New York, 10016.  In addition, as a Housing Development Fund Corporation, Cecil HDFC is a limited equity housing cooperative

incorporated under Article XI of the New York State Private Housing Finance Law (PHFL) and the Business Corporation Law (BCL).  Cecil HDFC is the nominal landlord party to Plaintiff's lease and the fee owner of the real property located at 206 West 118th Street, New York, New York 10026 (the "Cecil Hotel"), the SRO building where Plaintiff lives.

18.    Defendant Housing and Services, Inc. ("Housing Inc.") is a not-for-profit corporation duly organized and existing under the laws of the State of New York and having its principal place of business at 202 East 135th Street, New York, New York  10016.  Defendant Housing Inc.'s mission includes ending chronic homelessness, preventing displacement for those at risk, and improving housing conditions for the marginalized through the development and management of permanent supportive housing projects, including the Cecil Hotel.

19.    The Cecil Hotel is operated by defendants Cecil Housing Development Corporation and Housing and Services, Inc. (collectively, "Owner") in conjunction with non-party New York City Housing Preservation and Development ("HPD").  The Cecil Hotel is funded by public money from non-parties the United States Department of Housing and Urban Development ("HUD") and HPD, the latter of which is a party to Plaintiff's lease and regulates the operation of buildings under its auspices, including the Cecil Hotel.

20.    Defendant Housing Inc. provides all management services at the Cecil Hotel and is believed to be the parent company or affiliate of Cecil HDFC.  Cecil HDFC and Housing Inc. are alter egos of each other for all purposes relevant to this complaint.

21.    Defendant Ralph Garcia is a natural person employed by Owner as the chief of security whose duties include the safety and security of the Cecil Hotel.  Upon Information and belief, he formerly was employed by the City as an NYPD Lieutenant, a position from which he

retired.  Defendant Ralph Garcia's domicile is unknown to Plaintiff without discovery but he is believed to be domiciled in the State of New York.

## JURISDICTION AND VENUE

22.     This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiff's claims against the City and Officer Defendants (collectively, the "Municipal Defendants")  arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States.

23.     This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, over Plaintiff's claims against Owner and Ralph Garcia (collectively, the "Private Party Defendants") arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the Constitution of the United States.

24.     This Court has supplemental subject matter jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's claims against the Private Party Defendants arising under the Constitution and laws of the State of New York and City of New York, because those state-law claims are so related to Plaintiff's original-jurisdiction federal claims that they form part of the same case or controversy under Article III of the Constitution of the United States.

25.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) in that all Defendants reside in the State of New York and at least one defendant is located in this district, and because the events giving rise to Plaintiff's claims occurred in this district.

## BACKGROUND AND TERMINOLOGY

26.     This case concerns the constitutional and legal protections afforded to people who are selected for discrimination because they do not conform to society's norms and expectations relating to gender.  Before considering the relevant facts in detail, it is helpful to explain some of

the relevant terminology and to consider the nature and cultural significance of sex, gender, gender identity, and gender expression.

27.     A person's "sex" refers to biological characteristics of the physical human body that are independent of social or political context.  The vast majority of persons either possess one X and one Y chromosome and are born as a male or posses two X chromosomes and are born female.

28.     A person's "gender," on the other hand, has only a tenuous connection to biology and is almost entirely a social construct of what it means to be masculine or feminine, to act like a man or act like a woman.  "Gender identity" is a person's sense of being a male, female or somewhere in-between.  "Gender expression" describes the outward physical characteristics and behaviors that one's culture defines as belonging to a male or female, for example dress, mannerisms, speech patterns and social interactions.

29.     A person whose gender identity and gender expression comport with their society's gender norms for their sex are referred to as "cis-gendered."  A significant number of people, however, are gender non-conforming, for example because they are masculine women or feminine men or because they wish to love and partner with a person of the same sex.  A "person of trans experience" has a gender identity and gender expression that non-conforms so profoundly that it corresponds to their society's gender norms for the other sex.  A person of trans experience who openly manifests their true gender identity is said to "transition" from one gender to the other in a process can involve counseling, hormone therapy, surgery and other social and physical processes.  Once a person of trans experience transitions, if their outward appearance objectively comports with their identified sex they are often referred to as "passable."

30.     Like all social constructs, the concept of gender varies widely between cultural contexts and over time.  The construct of gender, however, almost uniformly mirrors the binary classification applied to sex.  In other words, although different cultures at different times have ascribed varying characteristics to men and women, the very notion of gender presupposes that all people naturally and obviously manifest one of two mutually exclusive, neatly arranged sets of behaviors and physical attributes that exactly correspond to their biological sex.

31.     The idea that sex and gender are dichotomies is so deeply ingrained in our thinking that it is presumed without conscious thought as immutable, but it is an entirely false dichotomy.  Even the notion of sex as binary is contrary to fact and without scientific basis.  The fact is that sex is like every other biological phenomenon and exists not as two mutually exclusive categories but rather as a continuum of physiological features.  Experience teaches that no two bodies are identical.  Indeed, the foundational observation of Darwin's theory of evolution is that on the population level individuals of a species vary in virtually every respect.

32.     Consistent with the fact of biological diversity within the human species, a small but significant number of people are born as intersex, meaning they have genetic material, genitalia, internal sex organs and/or secondary sexual characteristics that are typically found in both, or sometimes neither, males and females.  Contrary to the unchallenged notion that sex is a dichotomy, "any close study of sexual anatomy results in a loss of faith that there is a simple, 'natural' sex distinction that will not break down in the face of certain anatomical, behavioral, or philosophical challenges."[1]  Understanding that the entire notion of a binary classification of sex is a myth illuminates the obvious folly of reducing the entire biological and physiological complexity of the human existence into one of two mutually exclusive categories.

---

[1] Chinyere Ezie, Deconstructing the Body: Transgender and Intersex Identities and Sex Discrimination—The Need for Strict Scrutiny, 20 COLUM. J. GENDER & L. 141, 155 (2011).

33.     Considering the totality of the differences between the social expectations for men and women in child rearing, family, worship, art, sex, education, politics and every other area of human endeavor, compelling a person to conform to their society's gender norms can severely restrict a person's fundamental freedoms.  Such compulsion to gender conform is profoundly unjust and utterly irrational, because a person's conformance to gender norms bears no rational relationship to their ability to perform in or contribute to society and because such compulsion prevents a person from realizing their inner core of highest human potential.

34.     Nevertheless, wherever and whenever gender non-conformance is manifest, it calls down invidious discrimination.   Unfortunately, there is a long history of such discrimination and violence against persons of trans experience in particular.  The numbers are staggering.  According to the National Coalition of Anti-Violence Programs, 72% of anti-LGBTQ homicide victims are women of trans experience and 67% are trans women of color. According to that same source, persons of trans experience are 300% more likely to be the victims of police violence, and trans persons of color are twice as likely to be victimized by police violence than their white counterparts.

35.     Because persons of trans experience do not have the strength to politically protect themselves from wrongful discrimination, they continue to face legal, social and political obstacles to the free expression of their true identities, not to mention threats to their very lives and well being.  Sadly, that plight is illustrated by the facts of this case.

## FACTS COMMON TO ALL CLAIMS

**A.     Plaintiff overcame homelessness and found housing at Owner's Cecil Hotel.**

36.     Like far too many persons of trans experience, Plaintiff was rejected by her family after coming out and found herself homeless in New York City.

37.     In March 2013, Plaintiff was offered a subsidized room in the Cecil Hotel, Owner's SRO building offering subsidized housing through the auspices of HPD.

38.     According to the website of Owner, Housing Inc., its mission is to "end chronic homelessness, prevent displacement for those at risk and improve housing conditions for the marginalized through the development and management of permanent supportive housing . . ."[2]

39.     Specifically, Owner claims that,

> HSI [Housing Inc.] builds communities that help tenants achieve their fullest potential for housing self-sufficiency by assessing their individual needs and building respectful and caring environments to overcome barriers to their success. Our programs employ a housing first, harm reduction approach that is person-centered and outcome-oriented. Our primary goal is to keep residents housed, reduce crises, and help those most vulnerable re-integrate into social networks that they have long been excluded from; decreasing isolation, and promoting improved quality-of-life.

40.     Consistent with its mission and strategic plan, Owner adopted and promulgated House Rules that include, in relevant part:

> **TENANT CONDUCT**:  Tenants must not engage in conduct that interferes with the rights of other tenants to enjoy their apartments properly and peacefully or cause conditions that are dangerous, disruptive, hazardous, threatening, unsanitary or otherwise harmful to other residents, agency employees, and guests.  <u>Verbal threats or abusive behavior are not allowed under any circumstances. Weapons, fights or violence of any kind will not be tolerated as the safety and security of the entire community is our overriding priority</u>.

> **NOISE**:  In consideration of other tenants, activities that result in loud noise (e.g., radios, computers, and televisions set at higher volumes) that could impair the sleep of other individuals are not allowed before 9:00 a.m. or after 10:00 p.m. However, please be considerate of your neighbors **at all times** - keeping entertainment, conversations, and other activities at a reasonable volume throughout the day.  (bold and underline in original).

---

[2] <u>See</u> http://www.hsi-ny.org/#!our-mission/c1yxr, last visited September 2, 2015.

41.     Plaintiff had applied for subsidized housing at the Cecil Hotel because she was determined to obtain a safe, supportive home environment specifically accepting of persons of trans experience.  Before committing to her lease, Plaintiff specifically discussed with Kristi, Owner's managerial agent, Plaintiff's concerns about her safety and well being, not just her physical safety but her emotional and psychological well being, too.  Owner assured Plaintiff that the Cecil Hotel would be a safe, supportive environment where she could freely express her gender identity as a person of trans experience.  Based upon their assurances and all of the lovely promises contained in Owner's literature and on their website, Plaintiff signed the lease and moved into the Cecil Hotel on April 1, 2013.

**B.      Owner and the NYPD repeatedly refused to allow Plaintiff access to the police protection otherwise available in the community, thereby ratifying and encouraging her Tormentors' violence.**

42.     Within a few weeks the whispers started.  "Is that a man?"  The whispers grew louder and became statements.  "That's a man!"  "Look at that man!"

43.     When Plaintiff complained to Owner, she was criticized or threatened for complaining and told essentially to just get along.

44.     When her Tormentors saw that Plaintiff's complaints and requests for help to the Owner were deflected or resulted in Owner's retribution or ridicule towards Plaintiff, Tormentors escalated the frequency and intensity of their abuse.

45.     When Plaintiff called for police assistance, Owner and its security officers interfered with Plaintiff's attempts to exercise her right as a crime victim to file a criminal complaint with the NYPD, falsely represented that Plaintiff's dispute was part of a special "program" that would be addressed as part of the "program" by the "program coordinator," falsely implying that the Cecil Hotel's tenants were under some legal impairment.

46.     Owner and its security officers denigrated Plaintiff and her credibility to the NYPD, for example by describing her as always complaining or dishonest.

47.     Owner's employee, Security Officer Garcia, frequently referred to Plaintiff dismissively as "Jennifer Lopez" or "J Lo" to the NYPD's various responding officers, almost always eliciting a smile or chuckle from the officers.

48.     When her Tormentors saw that Plaintiff's complaints and requests for help to the NYPD went unanswered or resulted in the NYPD's dismissing or even ridiculing Plaintiff, Tormentors escalated the frequency and intensity of their abuse still further.

49.     Within three months of moving into the Cecil Hotel, and ever since then, Plaintiff has endured near-constant abuse that disturbs her sense of well being and compromises her physical and mental health.  Her Tormentors go out of their way to hurl the words "man" and "he" and "bastard" at Plaintiff as if it were Plaintiff's name.  Plaintiff endures being awoken to her Tormentors shouting vulgar epithets that cannot be repeated in this forum, many aimed in one way or another at Plaintiff's expression of her gender identity. Her Tormentors intentionally disturb Plaintiff's sleep and threaten her safety and security in some form or another.

50.     For example, Plaintiff has adopted a largely nocturnal lifestyle to minimize contact with her neighbors.  One favorite tactic of her Tormentors is to scream and play loud music purposefully to wake Plaintiff up, then turn it down when security arrives, then back up, and on and on.  As the Tormentor residing in apartment 3K once screamed at Plaintiff, after the police had left once again without taking a complaint from Plaintiff, "If you think this is that loud wait till I get this next [radio] box, you ain't never going to sleep."

51.     Another running "joke" amongst the Tormentors is to accuse Plaintiff of fouling the shared bathrooms in loud, obscene language designed to derogate Plaintiff for her gender expression, with explicit references to her genitalia and appearance.

52.     Often Plaintiff is threatened with violence.

53.     Plaintiff is the only person of trans experience who lives on her floor of the Cecil Hotel.

54.     Plaintiff's Tormentors do not abuse or torment any other person in the Cecil Hotel.

55.     Plaintiff's Tormentors have selected Plaintiff for abuse, in whole or substantial part, because of Plaintiff's honest expression of her gender identity.

56.     Owners and their security officers, including defendant Ralph Garcia and Security Officer Garcia, do not abuse or mistreat any other resident of the Cecil Hotel in the manner that they mistreat Plaintiff.

57.     Owners and their security officers, including defendant Ralph Garcia and Security Officer Garcia, have selected Plaintiff for abuse, in whole or substantial part, because of Plaintiff's honest expression of her gender identity.

58.     The specific acts of abuse are too numerous to recount in detail but all follow the same pattern.   First, the Tormentors' abuse continues unabated until it escalates beyond harassment to threats of physical or sexual violence, compelling Plaintiff to call 911.  When the NYPD responds, Owner's security officers tell the NYPD's officers that the "program director" will take care of Plaintiff's issue the next day, or that Plaintiff's complaints about her Tormentors are "all part of the program," or other words intended falsely to communicate to the NYPD that the Cecil Hotel is a "program" for the mentally ill, addiction rehabilitation or the like.

59.     It is noteworthy that the promotional literature of Owner, Housing Inc.,
specifically provides under the heading "how it works" the following statement:[3]

> We employ a housing first, harm reduction approach that is
> person-centered and outcome-oriented, enabling homeless
> individuals to address the complex barriers to their health and
> housing stability by:
>
> delivering safe, clean, permanent homes without conditions - our
> tenants are not required to meet **any** prerequisites before moving
> into HSI housing including attaining sobriety, going through
> rehabilitation programs, or receiving mental health treatment.
>
> providing access to wide-ranging on-site services that are elective
> and customized -  targeting the root causes of homelessness that
> resulted in displacement originally including poor health, untreated
> mental illness, chemical dependency and lack of educational and
> vocational opportunities. HSI programming is comprehensive,
> tailored to each individual's needs.

60.     Upon hearing the word "program," the NYPD's officers invariably abdicate their
police powers to Owner, telling Plaintiff that her complaints against her Tormentors must be
addressed to Owner and that Plaintiff cannot file any complaint with the NYPD.

61.     For example, in or about July 2013, the Tormentor residing in apartment 3P
propositioned Plaintiff for sex.  On a prior occasion, he had threatened to kill Plaintiff.  On each
occasion, the NYPD responded, Security Officer Garcia, Owner's security guard, told the
responding officers that the issue would be addressed with the "Program Coordinator" the next
day.  The NYPD officers then told Plaintiff that all complaints must be addressed to Owner.
Plaintiff told the responding officers, "he said he would kill me," to which one officer responded,
"that's not a crime."

62.     As a further example, on April 19, 2015, the Tormentor who resides in apartment
3R began to yell through Plaintiff's door, "I am going be very sorry that I did not kill him

---

[3] See http://www.hsi-ny.org/#!the-hsi-model-/c2085, last visited September 2, 2015.

[Plaintiff], I am tired of this shit.  I want to go to jail today for the first time, you come out that room, come out that room, I am not playing neither come on out of that room, they going to take my ass to jail today."  When the NYPD responded to Plaintiff's call for help, Security Officer Garcia once again told the NYPD officers that the "program" would take care of the issue and the responding officers turned on a dime and left, refusing to take any complaint from Plaintiff.

63.     Plaintiff wrote to Owner numerous times, including in connection with the incident on April 19, 2015, when Plaintiff wrote,

> S/O Garcia told a female police officer "This will all be dealt with when the program supervisor comes in on Monday."  Making it sound like the police did not need to do anything.  Also telling the police that this is "a program."  Which is a tactic used get NYPD not to do anything. . .
>
> S/O Garcia continuously inserts herself into the middle of situations when the police are called.  I have previously made written complaints about S/O Garcia many times.  These reports have not been responded to and S/O Garcia continues to be a major problem.  She purposefully attempts to get the police not to take any action when I am having problems with my neighbors that require police action to be taken.

64.     Plaintiff had previously complained to Owner about Owner's security officers' interference with her ability to exercise her right lawfully to complain to the police when she is the victim of a crime.  For example, on February 19, 2015, Plaintiff wrote to Owner:

> I am writing you this letter in regards to Security Officer Garcia's inappropriate behavior.  There have been continued problems with SO Garcia and I have submitted grievances about her in the past.  The following complaints are still continuing:
>
> 1.      Interfering with my communications with the police when I have to call them.  Today while the police where here, SO Garcia once again interfered as a referee attempting to side with the police.  Then further refereed to me as Ms. Jennifer Lopez, causing the police to laugh and not take me seriously.

> 2.   SO Garcia continues to walk in the halls loudly, whistling, singing and talking loudly to the residents.  SO Garcia has woken me up many times with this behavior.  I consider this to be harassment and a violation of my right to privacy
>
> I am requesting that the interference and harassment stop.  I am suggesting that SO Garcia be suspended or terminated, due to the amount of times this has occurred.

65.   Long before that, Plaintiff had complained about the abuse she suffers at the hands of her Tormentors.  For example, on March 5, 2014, Plaintiff wrote Owner about the various forms of abuse and harassment she was suffering, writing,

> I beg once again that you take my complaints seriously and that action be taken to allow me the peaceful living that I deserve as by law and a paying tenant. If this is not handled properly I will have no other alternative then to seek an attorney for advise and possible representation.

66.   Prior to that, on January 21, 2014, Plaintiff wrote a lengthy letter to the Owner detailing the events of the prior day, writing that after her noise complaints were ignored by Security Officer Garcia,

> Due to 9 months of having to deal with this issue, not getting anywhere with building management, whom is responsible for the quality of life in the apartments that they rent out, I decided it would be best to talk with a supervisor in the New York Police Department. I did just that and the supervisor informed me that "Any resident that is leaving their door open is creating a fire hazard." The supervisor also said "If you can hear music from your apartment it is too loud." He said that he would send two officers over to the building to talk with the 2 tenants that I was complaining about.
>
> When the police arrived [SO] Garcia came over and immediately began speaking with the female police officer. Telling the female police officer "she is always complaining (while referring to me), I go up when she complains and their music is not loud, . . . [SO] Garcia continued to take sides between the tenant of 3R and the Officer Edwards (male officer) as he was letting the tenant know that the tenant could not be yelling from his room out into the hall and he could not have his music up really loud.  During the

conversation with the tenant of 3R he admitted to yelling for me to wake up and purposely turning his music up loud.  The tenant of 3R at one pointed stated "staff have told me it is okay to yell from my room, I have to yell out of my room to get the attention of my friend that is my neighbor (referring to 3P)." . . . At one point Garcia interrupted and said "you guys just need to get along, we cannot be having the police come for stuff like this, you both just need to work it out."

. . . [SO] Garcia was adamant about defaming my character to the police officers.  She stated to the police officers that the building management allows tenants to keep their doors open and "this is a building management issue not a police issue." She continued, "We have patients here that require us to check on them from time to time. That is why they leave their doors open. . . Then [SO Garcia addressed me and said "Ms. Lopez you just need to learn to get along with your neighbors." . . . at one point Officer Edwards told me "You have to listen to her." I replied that she is not staff, Officer Edwards said "Yes she is building management and you have to follow whatever directions she gives you."

In embarrassment and frustration from my character being defamed by [SO] Garcia to the Police Officers, I went back to my apartment. . . Due to her representation, I believe the police discredited my statements and complaints. . .

67.     Despite calling for police help dozens of times, the NYPD repeatedly has refused to take any criminal complaint from Plaintiff, except the one described in paragraph 79 of this Complaint.

68.     It is noteworthy that the NYPD Patrol Guide imposes a non-discretionary duty to accept all criminal complaints, defined as "an allegation of an unlawful or improper act or omission, or other condition that necessitates investigation to determine if any unlawful act or omission occurred."  NYPG Patrol Guide, Procedure No: 207-01.  Although a complaint might be closed as unfounded under NYPG Patrol Guide, Procedure No: 207-07, all complaints shall be recorded because, "[p]roper complaint reporting is essential for statistical analysis, discovery of crime patterns and trends, efficient deployment of resources, and uniform crime reporting.

Every member of the service involved in this process has a responsibility and obligation to ensure the integrity of this vital, strategic resource." NYPD Patrol Guide, Procedure No: 207-01.

69.     Further, NYPD officers have a nondiscretionary duty to report all allegations of misconduct against uniformed members of the service, including an allegation that an officer failed to take and file a complaint.  *See, e.g.,* NYPG Patrol Guide, Procedure No: 207-31.

70.     Proper reporting of criminal complaints is especially vital in the context of discrimination based upon gender expression, crimes which are under reported.

71.     It is equally noteworthy that the New York Hate Crime Law § 485.05 provides for a separate offense and additional penalties where a person commits a specified offense and selects either the criminal act or its victim in whole or in substantial part because of a belief or perception regarding a person's expression of their gender identity.

72.     Tormentors clearly selected Plaintiff in whole or substantial party because she is a person of trans experience.

73.     The specified offenses include the following provisions of the N.Y. Penal Law, all of which describe the Tormentors' conduct that has victimized Plaintiff:  § 240.25 harassment in the first degree; § 240.30 aggravated harassment in the second degree;  § 120.45 stalking in the fourth degree; § 120.50 stalking in the third degree; § 120.14 menacing in the second degree; and § 120.15 menacing in the third degree.

**C.     NYPD command structure ignored Plaintiff's pleas for help and colluded with the Private Party Defendants to violate Plaintiff's Constitutional rights.**

74.     In or about December 2014, Plaintiff went to the 28th Precinct and spoke to NYPD Officer Victor Pena.  After listening to the details of Plaintiff's complaints against her Tormentors and Owner's security officers, Officer Pena told Plaintiff that the NYPD would send

NYPD officers to the Cecil Hotel to address Plaintiff's concerns, speak to her neighbors, and speak to Owner and its security officers.

75.     Plaintiff thereafter went to Owner's chief of security, Defendant Ralph Garcia. Plaintiff recounted her conversation with Officer Pena.  Defendant Ralph Garcia told Plaintiff that he is a retired NYPD lieutenant and communicated that he would "make a few calls" to assure that the NYPD did not respond to Plaintiff's complaints.

76.     Defendant Ralph Garcia, as the head of Owner's security, was aware of Plaintiff's complaints and the abuse she suffered and was kept apprised by the security officers he supervised of the events concerning Plaintiff's claims.

77.     Officer Pena's promises of NYPD assistance never materialized.

78.     In May, 2015, Plaintiff again went to the 28th Precinct to appeal for help. Plaintiff met with Deputy Inspector Obe, the commanding officer of the 28th Precinct, and explained in detail all of Plaintiff's ordeal and the nature of her complaints against her Tormentors, Owners and their security officers, and the numerous NYPD Officer Doe defendants who had refused to take Plaintiff's complaints over the previous two years.

79.     Deputy Inspector Obe told Plaintiff that her concerns would be addressed, that Deputy Inspector Obe personally would come to speak to Plaintiff's Tormentors and Owners to mediate and resolve Plaintiff's concerns.  Deputy Inspector Obe's promises of NYPD assistance have not yet materialized.

80.     At that meeting with Deputy Inspector Obe, the NYPD accepted and filed a criminal complaint from Plaintiff against her Tormentor residing in apartment 3L.  Thereafter, however, the NYPD did not arrest, interview or otherwise restrain that person, any other Tormentor, or any other person at the Cecil Hotel in connection with Plaintiff's complaint.

81.     In August 2014, while suffering another hateful diatribe, Plaintiff struck one of her Tormentors in the face as he came close enough to physically intimidate her to the point where she reasonably anticipated a battery and felt compelled to protect herself.   Another Tormentor grabbed Plaintiff and dragged her roughly down the hall before she escaped his grasp and left the building to get away.

82.     Owner then coordinated with the NYPD to effect an arrest of Plaintiff later that day at her apartment.   The NYPD arrested only Plaintiff and once again did not file a criminal complaint from Plaintiff.

83.     Owner then informed Plaintiff that the house rules require tenants to refrain from disturbing their neighbors and that Plaintiff no longer qualified for any of the social services previously provided to Plaintiff and otherwise available to the residents of the Cecil Hotel. Specifically, they told Plaintiff that she should be ashamed of herself for striking a neighbor.

84.     None of Plaintiff's Tormentors ever have been disciplined or penalized for their abuse of Plaintiff.

**D.     Defendants conspired to falsely detain Plaintiff for psychiatric evaluations.**

85.     Since Plaintiff filed her original Complaint in September, 2015, Defendants have continued to violate Plaintiff's rights, in an ongoing campaign to dissuade Plaintiff from asserting her rights and to discredit Plaintiff and her claims.

86.     For example, on multiple occasions Plaintiff complained about the noise her Tormentors used to deliberately and unreasonably disturb Plaintiff's sleep.   Each time, Plaintiff was denied an opportunity even to file a complaint.

87.     In sharp contrast, on January 29, 2016, a few hours after midnight, one of Plaintiff's Tormentors complained a single time that Plaintiff pounded on their common wall and

yelled, "keep it down."   Owner summoned the police and directed the NYPD's responding officers to forcibly remove Plaintiff from her home in the middle of the night and take Plaintiff to a hospital to be evaluated for involuntary, psychiatric confinement.

88.     Owner's direction -- unsupported by any specific, articulable facts or probable cause -- was sufficient for the responding officers to forcibly remove Plaintiff from her home in the middle of the night and take Plaintiff to the hospital for a psychiatric evaluation.

89.     Plaintiff was released from that hospital less than an hour after the NYPD took her there.  Upon her release, Plaintiff was told by the medical staff that there was no reasonable basis for the NYPD to have detained Plaintiff against her will for any psychiatric reason.

90.     The very next night, on January 30, 2016, Owner again summoned the NYPD and directed the responding officers to forcibly remove Plaintiff from her home in the middle of the night and take Plaintiff to a hospital to be evaluated for involuntary, psychiatric confinement.

        **E.     Defendants conspired to falsely arrest Plaintiff.**

91.     As a further example of Defendants' ongoing violation of Plaintiff's rights, on multiple occasions Plaintiff complained that one of her Tormentors physically battered Plaintiff, by pushing or punching her.  Each time, Plaintiff was denied an opportunity even to file a complaint.

92.     One evening in June, 2016, the Tormentor who lives in apartment 3W attacked Plaintiff in the Cecil Hotel's television room.  During and immediately preceding that attack, he used transphobic slurs against Plaintiff.

93.     The Tormentor in 3W is more than six feet tall and physically imposing.  When he hit Plaintiff, she retreated and asked Owner's security officers to call the police.

94.     When the NYPD responded to that call, Defendant Ralph Garcia falsely told the responding officers that Plaintiff had "swung at" the Tormentor in 3W.

95.     The responding officers refused to take or file a complaint from Plaintiff against the Tormentor in 3W.

96.     Later that same evening, the Tormentor in apartment 3R ("3R")attacked Plaintiff in the Cecil Hotel's ground-floor lobby, near the security office.  He struck Plaintiff repeatedly until Plaintiff eventually was able to grab his arms, to protect herself.  During and immediately preceding that attack, he used transphobic slurs against Plaintiff.

97.     3R then grabbed and restrained Plaintiff, who resisted until she was able to get one of her hands on his face and push him away.

98.     Plaintiff yelled for Owner's security officers to call 911.

99.     When the NYPD responded to that call for help, Plaintiff's second of the night, they observed physical injuries to Plaintiff because of 3R's attack and took Plaintiff to the hospital without taking or filing any complaint from her.

100.    Unbeknownst to Plaintiff, after the NYPD took Plaintiff to the hospital, Owner's security officers falsely told the responding NYPD officers that Plaintiff had been the attacker instead of the victim.

101.    Owner directed the NYPD's responding officers to take a complaint from 3R and not to take any complaint or cross-complaint from Plaintiff.

102.    Based only upon Owner's directions, and contrary to the physical evidence, the responding officers took and filed a criminal complaint from 3R against Plaintiff.

103.    Meanwhile, Plaintiff was treated for the injuries she sustained during 3R's attack and released from the hospital later that same night.

104.    The next day, NYPD officers came to Plaintiff's apartment, arrested her in connection with 3R's false complaint, and again declined to make or file any complaint from Plaintiff against 3R.

105.    As a result of that false arrest in June 2016, Plaintiff faces criminal charges and must appear in criminal court later this month.

106.    As a further result of that false arrest in June 2016, just today, the NYPD served Plaintiff with an order of protection against Plaintiff.  That order of protection, by its terms, prohibits Plaintiff from entering or approaching the Cecil Hotel, the building where she and 3R both live, forcing Plaintiff to choose between being homeless or being arrested for going home.

107.    Being once again homeless, because of the false arrest relating to 3R's false complaint, Plaintiff intends to spend the night in the South Ferry station or riding the subway, after imbibing enough alcohol to quell the anxiety and fear enough to steal a few hours of sleep.

## COUNT I
(Plaintiff's 42 U.S.C. § 1983 claim against the Officer Defendants)
(Fourteenth Amendment right to equal protection of law)

108.    Plaintiff incorporates by reference each and every allegation contained in this Amended Complaint.

109.    The Officer Defendants knowingly violated Plaintiff's clearly established equal protection rights as secured by the Fourteenth Amendment to the Constitution of the United States.

110.    First, compared with others similarly situated, the Officer Defendants selectively mistreated Plaintiff in several respects.  For example, Officer Defendants repeatedly refused to make and file a criminal complaint from Plaintiff against her Tormentors in apartments 3R and 3W -- even when her complaints were supported by physical evidence or admissions of physical

violence or threats of physical harm.  In contrast, Officer Defendants have detained or arrested Plaintiff in response to even a single, unsubstantiated complaint, even when the Tormentor was the only aggressor and Plaintiff the victim.

111.    In this regard, it is noteworthy that the NYPD Patrol Guide itself establishes a non-discretionary duty for officers to "take and record" all "allegations of an unlawful or improper act or omission, or other condition that necessitates investigation to determine if any unlawful act or omission occurred." NYPD Patrol Guide, Procedure No:  § 207-01.  Similarly, all NYPD officers have a nondiscretionary duty to report all allegations of misconduct against uniformed members of the service, including an allegation that an officer failed to take and file a complaint, was discourteous or used offensive language.  See NYPD Patrol Guide, Procedure No: 207-31.

112.    The Patrol Guide is, at a minimum, evidence of the standard of police officer conduct that is communicated to NYPD officers by its policy makers and demanded by its supervisors.  Thus, even though police officers may retain a degree of discretion in the exercise of their duties, it is reasonably certain that the standard of conduct articulated in the Patrol Guide describes the conduct typically encountered by persons who interact with the NYPD.

113.    Accordingly, it is equally certain that Plaintiff was selectively mistreated compared to numerous additional comparators that will be identified during discovery in this action.  For example, Plaintiff expects discovery to reveal numerous persons who, like Plaintiff, (i) approached an NYPD officer who was either on duty at a precinct or responding to a 911 call; (ii) informed the officer that the person was a crime victim and wanted to make and file a complaint for aggravated harassment; (iii) described the offensive conduct to the officer; and (iv) showed the officer the written communication evidencing the threat of harm.  Plaintiff expects

discovery to reveal that in each such instance, the complainant, unlike Plaintiff, was allowed to make and file a criminal complaint.

114.    By their affirmative acts, the Officer Defendants selectively withdrew from Plaintiff police protection services that would otherwise have been available in the community, and they did so solely because Plaintiff is a person of trans experience, i.e., a member of a disfavored, but protected, class of persons.

115.    It is noteworthy that 42 U.S.C. § 1983 is the contemporary codification of the Enforcement Act of 1871 -- also known as The Civil Rights Act of 1871 or the Ku Klux Klan Act -- which was passed during Reconstruction to address attacks on Fourteenth Amendment rights of persons of color.  Such attacks specifically included the selective withdrawal of police protection from disfavored persons, which is a per se equal protection violation.

116.    Second, Officer Defendants selectively mistreated Plaintiff based on the impermissible consideration that she is a person of trans experience.  The Officer Defendants' discriminatory animus is evidenced by several affirmative acts, including for example dismissive utterances regarding persons of trans experience and laughing and joking at Tormentors' use of transphobic slurs and abuse.

117.    The Officer Defendants' discriminatory animus is evidenced also by their protracted, inexplicable refusal to take any criminal complaint from Plaintiff, even when supported by physical evidence and relating to conduct actually witnessed by the officers, coupled with their repeated willingness to arrest or detain Plaintiff at Owner's direction.

118.    Third, the Officer Defendants' conduct was not substantially related to an important government interest.  To the contrary, the NYPD's own policies reflect the important government interest in reporting all allegations as "essential for statistical analysis, discovery of

crime patterns and trends, efficient deployment of resources, and uniform crime reporting." NYPD Patrol Guide 207-01.

119.    Further, there is a particularly important government interest in addressing hate crimes, as reflected in the New York State Assembly's declaration that such crimes "tear at the very fabric of free society."  The Officer Defendants' conduct undermines that government interest by condoning and therefore encouraging crimes against persons of trans experience.

120.    Although it is true that there is an important government interest in wisely allocating necessarily limited police resources and the NYPD may have had discretion in how to file and investigate Plaintiff's complaints, on these facts they lacked the discretion to do nothing.

121.    The conduct of the Officer Defendants devastated Plaintiff, whose physical and mental health continue to suffer as a direct and proximate result of the Officer Defendants' misconduct.

122.    Separate from the damages caused by her Tormentors' conduct, the Officer Defendants' abuse of Plaintiff inflicted a distinct, deeper harm all its own.  The Officer Defendants and the agents of their choosing, Owner and Tormentor, repeatedly violated Plaintiff and did so publicly and with apparent impunity, despite Plaintiff's resort to the chain of command and the courts.  Those acts communicated to Plaintiff's neighbors, family, to Plaintiff's entire community, that she is beneath the law, beneath civility, a plaything to be harmed or broken with impunity, less than human.  The Officer Defendants' conduct assaulted Plaintiff's personal dignity in a way that no physical attack alone could and inflicts damages orders of magnitude beyond mere physical injury.

123.    The Officer Defendants' culpable conduct relates to the official duties of a uniformed police officer discharging the police powers held and exercised by the state.  Those

duties include to take and file complaints of criminal activity, to take and file a report of any culpable act or omission by a police officer, to investigate criminal activity and make arrests where probable cause exists to do so, and to respond to emergency situations.  The Officer Defendants therefore acted under color of state law because they exercised power possessed by virtue of state law and made possible only because they were clothed with authority of state law.

124.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

125.    Further, the Officer Defendants' repeated inaction, over an extended period of time and in the face of the obvious risk to Plaintiff of severe consequences and extreme danger posed by Tormentors' conduct, is proof that the Officer Defendants focused on the risk of their unconstitutional conduct and deliberately assumed or acquiesced in such risk.  The Officer Defendants therefore acted either with an evil and malicious intent to harm Plaintiff or with a deliberate and callous indifference to Plaintiff's federally protected rights.  Because of that positive element of conscious wrongdoing and the reprehensibility of the Officer Defendants' conduct, Plaintiff is entitled to punitive damages against the Officer Defendants, in an amount to be determined at trial.

## COUNT II
(Plaintiff's 42 U.S.C. § 1983 claim against the Officer Defendants)
(Fourteenth Amendment right to substantive due process, state-facilitated danger)

126.    Plaintiff incorporates by reference each and every allegation contained in this Amended Complaint.

127.    The Officer Defendants knowingly violated Plaintiff's clearly established substantive due process rights as secured by the Fourteenth Amendment to the Constitution of the United States.

128.     First, the Officer Defendants deprived Plaintiff of her property rights to the police protection otherwise available in the community.  Ordinarily, police officers are not liable for harm inflicted by private citizens such as Tormentors and Owner, even where the officers fail to provide adequate police protection.  Here, however, the Officer Defendants are liable because they facilitated the harm that Tormentors and Owner have inflicted upon Plaintiff and the danger that Plaintiff continually faces.

129.     The Officer Defendants knowingly facilitated Plaintiff's vulnerability to Tormentors and Owner in numerous respects, including by repeatedly communicating to Tormentors and Owner that they would not be arrested, punished, or otherwise interfered with while engaging in misconduct likely to endanger Plaintiff's life, liberty and property.

130.     Officer Defendants' continued and public inaction -- on multiple occasions over an extended period of time and despite physical evidence of the Tormentors' escalating campaign of hate crimes and Owner's campaign of harassment -- and their active and public encouragement of Tormentors' and Owner's criminal behavior by laughing and smiling at the jokes made at Plaintiff's expense, and their refusal to discharge their statutory duty to protect Plaintiff from hate crimes and other crimes continues to embolden, encourage and condone Tormentors' and Owner's criminal and abusive behavior.

131.     The Officer Defendants' affirmative conduct communicates to Tormentors and Owner that there will be no consequence to committing criminal and violent acts against Plaintiff, increasing the likelihood of violence against Plaintiff.

132.     By intentionally putting Plaintiff in harm's way then sitting back to watch her injury unfold, the Officer Defendants engaged in a deliberate and unconstitutional act designed to inflict extreme and unprovoked pain in their defenseless victim.  Their actions are no different,

even if less direct, than chaining a person to a wall for days, or beating a person without provocation, or any other violence against a person.

133.     Second, the Officer Defendants' conduct was arbitrary.  As set forth above in greater detail, the Officer Defendants' conduct failed to comport with the NYPD's official practices regarding the making and filing of criminal complaints and arrests.  Further, the Officer Defendants' conduct undermines, rather than advances, the important government interests in accurately reporting crimes and using police resources wisely.

134.     In addition, the Officer Defendants' conduct was motivated, in substantial part, by bad faith and discriminatory animus against Plaintiff because she is a person of trans experience.

135.     Third, the Officer Defendants' conduct shocks the judicial conscience.  This is not a case where an officer makes an error in judgment during exigent circumstances, or has to make a split-second judgment call or manage a difficult situation.  To the contrary, the Officer Defendants had to refuse Plaintiff over and over and over again.

136.     The only conclusion is that the Officer Defendants' inaction, over an extended period of time and in the face of the obvious risk to Plaintiff of severe consequences and extreme danger posed by Tormentor's and Owner's conduct, is proof that the Officer Defendants focused on the risk of their unconstitutional conduct and deliberately assumed or acquiesced in such risk. In other words, the Officer Defendants had ample opportunity to deliberate and their actions therefore were deliberate.

137.     Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

138.     Further, the Officer Defendants acted either with an evil and malicious intent to harm Plaintiff or with a deliberate and callous indifference to Plaintiff's federally protected

rights.  Because of that positive element of conscious wrongdoing and the reprehensibility of the Officer Defendants' conduct, Plaintiff is entitled to punitive damages against the Officer Defendants, in an amount to be determined at trial.

## COUNT III
(Plaintiff's 42 U.S.C. § 1983 claim against the Officer Defendants)
(Fourth Amendment right to be free from unreasonable seizures - false arrest)

139.    Plaintiff incorporates by reference each and every allegation contained in this Amended Complaint.

140.    The Officer Defendants knowingly violated Plaintiff's clearly established right to be free from unreasonable seizures, as secured by the Fourth and Fourteenth Amendment to the Constitution of the United States.

141.    First, Plaintiff unquestionably was intentionally confined.  On the early morning hours of January 29, 2016, the responding Officer Defendants removed Plaintiff from her home in the middle of the night and took Plaintiff, against her will, to a hospital to be evaluated for involuntary, psychiatric confinement.

142.    Again in June 2016, the responding Officer Defendants removed Plaintiff from her home and took Plaintiff to the 28th Precinct, where she was detained in a holding cell for several hours before being processed in connection with 3R's false complaint then released without bail.

143.    Second, Plaintiff did not consent to her arrest and detention.  On January 29, 2016, Plaintiff repeatedly told the responding Officer Defendants that she did not consent to being removed from her apartment and did not consent to being taken to a hospital.

144.    Again in June 2016, Plaintiff repeatedly told the responding Officer Defendants that she did not consent to being removed from her apartment, arrested and detained in connection with 3R's false complaint.

145.    Third, the Officer Defendants had no justification for their confinement of Plaintiff.  On January 29, 2016, there were no specific, articulable facts to support any probable cause to believe that Plaintiff was a danger to herself or others or that she in any way needed immediate psychiatric care or supervision.   As Officer Defendant NYPD Shield No. 1313 admitted to Plaintiff, the only reason the Officer Defendants detained Plaintiff is that the security officers at the Cecil Hotel called 911 and stated that Plaintiff was behaving erratically, based solely upon a single complaint against Plaintiff for simply banging on a wall and yelling for quiet.  The responding Officer Defendants completely abdicated their duty to uphold the law and simply did Owner's bidding.

146.    Again in June 2016, there were no specific, articulable facts to support any probable cause to believe that Plaintiff had committed any crime.   To the contrary, it was Plaintiff, not 3R, who bore physical injuries of attack.  It was Plaintiff, not 3R, who was taken to the hospital by the NYPD's responding officers.   Owner's security camera footage clearly showed 3R was the aggressor and Plaintiff his victim.   The responding Officer Defendants nevertheless made and filed a criminal complaint from only 3R and arrested only Plaintiff.

147.    Even if the responding Officer Defendants had taken complaints from both Plaintiff and 3R in connection with the June 2016 attack, Plaintiff would not be homeless tonight because of the order of protection against Plaintiff and in favor of 3R.

148.    It is difficult to imagine a non-discriminatory, good faith explanation for Plaintiff's arrests and detentions based upon the facts and information at the scene.

149.     Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

## COUNT IV

(Plaintiff's 42 U.S.C. § 1983 claims against the City of New York, <u>Monell</u> liability)

150.     Plaintiff incorporate by reference each and every allegation contained in this Amended Complaint.

151.     The City's official custom or policy with respect to the NYPD's treatment of persons of trans experience is to abuse them.  Specifically, to refuse to make or file criminal complaints from crime victims who are persons of trans experience, to refuse to investigate or abate crimes against persons of trans experience, to condone acts of violence and abuse persons of trans experience by police officers against, and to condone and facilitate acts of violence or abuse of persons of trans experience by non-state actors.

152.     The City's custom or policy of violating the rights of persons of trans experience is evidenced by the numerous acts of abuse set forth in detail in this Amended Complaint.  Those acts encompass the culpable conduct of scores of police officers and the actionable conduct of two dozen police officers acting across three boroughs and over the course of two years.

153.     The City's custom or policy of violating the rights of persons of trans experience is evidenced also by the numerous acts of abuse set forth in actions brought before this Court, for example the complaint in action captioned *Marlow White v The City of New York et al.*, United States District Court for the Southern District of New York, Case No. 15-cv-6696.

154.     The City's custom or policy of violating the rights of persons of trans experience is evidenced also by the case of Rachel Burrous, a woman of trans experience who called 911 on August 10, 2015 to report that she had been a victim of domestic abuse in her Brooklyn apartment.  Despite the facts that Ms. Burrous bore obvious physical injuries from her spouse's

physical attack, that Ms. Burrous had an audio recording of her spouse's attack on her, and that her spouse's cross-allegations of abuse were not supported by evidence and flatly contradicted by the audio recording, the responding officers arrested Ms. Burrous and not her spouse.  In fact, the NYPD refused even to make or file a complaint from Ms. Burrous or to listen to the audio recording of her spouse's attack on Ms. Burrous.  Ms. Burrous was thereafter mistreated by the NYPD, who chained her to a wall for hours while other detainees were left unchained, and who referred to her as "it" and committed other acts of verbal abuse and transphobic slurs.

155.    The City's custom or policy of violating the rights of persons of trans experience is evidenced also by the Shagasyia Diamond, a woman of trans experience who on January 1, 2014 was visited at her Bronx apartment by several NYPD officers responding to a neighbor's noise complaint.  Despite the facts that no one had complained of any domestic abuse or violence, that both Ms. Diamond and her spouse steadfastly denied any such violence, and that there were no specific, articulable facts to support a conclusion that any such abuse had occurred, Ms. Diamond was arrested without probable cause, physically abused and verbally humiliated by transphobic slurs for hours, then released into a blizzard without a coat, boots or other appropriate gear, which clothing the arresting officers had specifically denied to Ms. Diamond.  Ms. Diamond was never charged with any crime or offense in connection with that false arrest.

156.    Thereafter, in the late summer or fall of 2015, Ms. Diamond was punched in the head and face by unknown assailants at a bodega near her Bronx apartment.  The responding officers refused even to take a criminal complaint from Ms. Diamond, despite the fact that she bore obvious wounds from the attack, and did so solely because she is a woman of trans experience.  The officers instead threatened to restrain Ms. Diamond.

157.     The City's custom or policy of violating the rights of persons of trans experience is evidenced also by the numerous acts of abuse that have been widely reported in the media over the past decade.  In a September of 2007, for example, the NYPD violently arrested and pepper-sprayed peaceful demonstrators at a celebration of the Sylvia Rivera Law Project, an organization that advocates for and provides free legal services to low-income people of color who are transgender.  In 2011, the NYPD arrested a man of trans experience together with numerous other people at an Occupy Wall Street event.  All of the cis-gendered protesters arrested with him were processed and released promptly.  The NYPD chained the man of trans experience to a wall for eight hours, without provocation or cause, before processing and releasing him.

158.     In February 2012, the NYPD repeatedly humiliated a woman of trans experience with derogatory epithets and taunts after they arrested her.  The NYPD attached her to a fence, with her arm painfully chained above her head, for more than a day.

159.     In August 2013, three women of trans experience were attacked by seven or more men who were enraged by their gender expression.  The women were beaten -- one of them to death -- right in front of the NYPD's Housing Bureau Precinct.  One Assailant confessed a week after the murder but was not even indicted, for manslaughter not murder, until March 2015.

160.     On October 12, 2014, four men attacked and severely beat a woman of trans experience in Brooklyn, hurling slurs and epithets at her soul as they hurled fists and boards at her body.  The victim, an American Indian, suffered a traumatic brain injury.  She was beaten so badly that a portion of her skull had to be removed.  Advocates for the victim involved with the case publicly criticized the NYPD detectives for not working diligently.  No arrests were made.

161.    Hundreds of other persons of trans experience have been abused by the NYPD but will never report that abuse, much less seek redress in a court of competent jurisdiction, either because of the belief that their complaints will not be heard or will result in mistreatment, or because of the danger of publicly identifying one's self as a person of trans experience, or because persons of trans experience are far more likely than cis-gendered persons to suffer homelessness, poverty, substance abuse and other impairments to asserting their rights. Anecdotally, a September 2015 New York Times article about the NYPD's long and sordid history of abusing persons of trans experience describes a transgender forum where each of the more than 200 attendees admitted that they had been mistreated by the NYPD; not a single one had complained.

162.    By force of persistent practice, the City's official custom or policy of violating the rights of persons of trans experience was the moving force that caused the denial of Plaintiff's constitutional rights and caused Plaintiff's damages, as described in this Amended Complaint.

163.    These discriminatory practices of the City are so persistent and widespread as to constitute a custom or usage with the force of law, and the discriminatory acts of subordinate and supervisory officers so manifest as to imply the constructive acquiescence of senior policy-making officials.

164.    Even if, and in the alternative, the finder of fact in this action determines there is no such policy of violating the rights of persons of trans experience, the NYPD and the City's policy makers have for years known about innumerable acts of police officers abusing persons of trans experience.

165.    It is noteworthy that in June 2012, the City announced that negotiations between the City, NYPD and LGBT advocacy groups concerning the NYPD's abuse of persons of trans

experience had resulted in revisions to the NYPD Patrol Guide that, "address an array of unique problems that transgender and gender non-conforming New Yorkers face when they are arrested or detained by the police, including prohibiting the use of incorrect gender pronouns and "the dangerous practice of cuffing [persons of trans experience] to benches and rails while in police custody."

166.    In light of that pervasive history and the historic animus against persons of trans experience, the City's and NYPD's policy makers know to a moral certainty that its officers will face situations where the rights of persons of trans experience will be threatened or violated by fellow officers or non-state actors, will attempt to make and file a criminal complaint about those criminal acts, and will be refused the right to do and instead subjected to further abuse.

167.    The City's and NYPD's policy makers know to a moral certainty that such situations will be difficult for officers who either are unfamiliar with the issues peculiar to persons of trans experience, who are confronted with a colleague's or a supervisor's abuse of a person of trans experience, or who themselves bear some degree of animus, even if subconsciously, against persons of trans experience.

168.    Adequate training regarding those issues will make it substantially less likely that the rights of persons of trans experience will be violated.

169.    The City's failure to properly train or supervise their subordinates in the comprehension and observation of an adequate policy regarding the treatment of persons of trans experience amounts to deliberate indifference to the rights of those who come in contact with the municipal employees.

170.    Accordingly, Plaintiff are entitled to compensatory damages in an amount to be determined at trial but believed to exceed $6,000,000, plus reasonable attorneys' fees and costs.

## COUNT V
(Plaintiff's 42 U.S.C. § 1983 claims against the Private Party Defendants)

171.    Plaintiff incorporates by reference each and every allegation contained in this Amended Complaint.

172.    The Private Party Defendants' culpable acts pertain to their coordinated, pre-arranged, collusive joint actions to deprive Plaintiff of her Fourteenth Amendment equal protection and due process rights and her Fourth Amendment right to be free of unreasonable search and seizure.

173.    The Private Party Defendants' culpable acts pertain also to their exercise of the public authority delegated to them by virtue of their contractual relationship with the City, through HPD, and in particular by virtue of the Officer Defendants' repeated delegation and deference to Owner and its security officers as the only forum where Plaintiff can seek redress as a crime victim.

174.    Accordingly, the Private Party Defendants acted under color of law in connection with their culpable conduct.

175.    As set forth above, Private Party Defendants' culpable conduct effected a clear violation of Plaintiff's Fourteenth Amendment equal protection and due process rights and her Fourth Amendment right to be free of unreasonable search and seizure, resulting in Plaintiff's damages.

176.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000, plus reasonable attorneys' fees and costs.

177.    Further, the Private Party Defendants' inaction, over an extended period of time and in the face of the obvious risk to Plaintiff of severe consequences and extreme danger posed by her Tormentors' conduct, is proof that the Private Party Defendants focused on the risk of

their unconstitutional conduct and deliberately assumed or acquiesced in such risk.  The Private

Party Defendants therefore acted either with an evil and malicious intent to harm Plaintiff or with

a deliberate and callous indifference to Plaintiff's federally protected rights.  Because of that

positive element of conscious wrongdoing and the reprehensibility of the Private Party

Defendants' conduct, Plaintiff is entitled to punitive damages against the Private Party

Defendants, in an amount to be determined at trial.

### COUNT VI
(New York Civil Rights Law § 79-n -- Private Party Defendants)

178.    Plaintiff incorporates by reference each and every allegation contained in this

Amended Complaint.

179.    Private Party Defendants have inflicted harm upon Plaintiff in whole or in

substantial part because of their belief or perception regarding Plaintiff's gender identity and

expression.

180.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be

determined at trial, plus reasonable attorneys' fees and costs.

181.    Further, Plaintiff is entitled to an injunction enjoining and restraining Private

Party Defendants from any further violation of Plaintiff's federally protected rights based upon

Plaintiff's gender identity and expression.

### COUNT VII
(New York City Human Rights Law - Private Party Defendants)

182.    Plaintiff incorporates by reference each and every allegation contained in this

Amended Complaint.

183.    Plaintiff is the victim of unlawful, discriminatory harassment and violence at the

hands of Private Party Defendants.

184.    Defendants' discriminatory conduct has interfered with Plaintiff's exercise or enjoyment of her rights as secured by the constitution or laws of the United States, the constitution and laws of the State of New York, and the laws of the City of New York.

185.    Defendants' interference with Plaintiff's rights is motivated in whole or in part by Plaintiff's actual or perceived gender identity and expression.

186.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, plus reasonable attorneys' fees and costs.

187.    Further, Plaintiff is entitled to an injunction enjoining and restraining Private Party Defendants from any further violation of Plaintiff's federally protected rights based upon Plaintiff's gender identity and expression.

188.    Further still, Plaintiff is entitled to punitive damages against the Private Party Defendants, in an amount to be determined at trial.

## COUNT VIII
(New York Executive Law § 290 *et seq*. - Private Party Defendants")

189.    Plaintiff incorporates by reference each and every allegation contained in this Amended Complaint.

190.    Plaintiff is the victim of unlawful, discriminatory harassment and violence at the hands of Private Party Defendants.

191.    Private Party Defendants' unlawful discriminatory conduct against Plaintiff is motivated in whole or in part by Plaintiff's actual or perceived gender identity and expression and has caused Plaintiff's damages.

192.    Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial, plus punitive damages, reasonable attorneys' fees and costs.

193.    Further, Plaintiff is entitled to an injunction enjoining and restraining Private Party Defendants from any further violation of Plaintiff's federally protected rights based upon Plaintiff's gender identity and expression.

## COUNT IX
(Permanent Injunction -- all Defendants)

194.    Plaintiff incorporates by reference each and every allegation contained in this Amended Complaint.

195.    Plaintiff is entitled to permanent and preliminary injunctive relief in connection with her federal claims because Plaintiff can demonstrate the imminent threat of irreparable harm and a substantial likelihood of success on the merits, and that the balance of the equities and public interest favor injunctive relief.

196.    Specifically, in the absence of injunctive relief, Plaintiff and other persons of trans experience will remain vulnerable to the NYPD's systemic and pervasive deprivation of their rights secured by the Fourth and Fourteenth Amendment to the Constitution of the United States.

197.     Plaintiff has no adequate remedy at law because the affronts to her dignity and ongoing risk of physical violence and other abuse, either at the hands of the NYPD, Owner, or persons acting without fear of repercussion for such violent acts -- cannot be compensated by money damages.

198.    Further, any retrospective relief obtained by Plaintiff against the Officer Defendants cannot address the threat of suffering further constitutional violations by other NYPD officers acting further to the NYPD's discriminatory policy.

199.    The public interest, as expressed for example in the Hate Crime Law, strongly favors enjoining systemic abuse of persons of trans experience, and the balance of the equities tips decidedly in Plaintiff's favor.

200.   Accordingly, Plaintiff is entitled to a preliminary and permanent injunction: (i) enjoining the City from refusing to take criminal complaints from Plaintiff or from any other crime victims solely because the victim is a person of trans experience; (ii) compelling the City to adopt, promulgate and enforce policies and procedures to assure that persons of trans experience receive from the NYPD equal protection of law, including freedom from violence at the hands of police officers and freedom from acts and omissions of police officers that communicate, directly or indirectly, to non-state actors that violence and other criminal acts against persons of trans experience will be tolerated or condoned;  (iii) compelling the City to examine and adjust its polices and practices to assure that respect is afforded to the human and civil rights of persons of trans experience; and (iv) awarding Plaintiff such other and further relief as is just and proper.

**Pursuant to the Seventh Amendment to the Constitution of the United States and Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.**

**WHEREFORE**, plaintiff respectfully prays for judgment against Defendants as follows:

(1)    that Officer Defendants and the City of New York, its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with the City who receive actual notice of the Court's order by personal service or otherwise, be ordered as follows:  (i) enjoining the City from refusing to take criminal complaints from crime victims who are persons of trans experience; (ii) compelling the City to adopt, promulgate and enforce policies and procedures to assure that persons of trans experience receive from the NYPD equal protection of law, including freedom from violence at the hands of police officers and freedom from acts and omissions of police officers that communicate, directly or indirectly, to non-state

41

actors that violence and other criminal acts against persons of trans experience will be tolerated or condoned;  (iii) compelling the City to examine and adjust its polices and practices to assure that respect is afforded to the human and civil rights of persons of trans experience; and (iv) enjoining Defendants from committing any further discriminatory acts against Plaintiff.

(2)     awarding Plaintiff compensatory damages in an amount to be determined at trial but believed to exceed $2,000,000;

(3)     awarding Plaintiff punitive damages, against the Officer Defendants and Private Party Defendants, in an amount to be determined at trial;

(5)     awarding Plaintiff interest, including pre-judgment interest, on the foregoing sums;

(6)     awarding Plaintiff her costs in this civil action, including reasonable attorneys' fees and expenses, pursuant to 42 U.S.C. § 1983; and

(7)     awarding Plaintiff such other and further relief as the Court may deem just and proper.

Dated: Bronx, New York
       July 18, 2016

                              LAW OFFICE OF DONALD R. DUNN, JR.


                              By: _____/S/_____
                                   Donald R. Dunn, Jr. (DD0069)
                              441 East 139th Street
                              Bronx, New York 10454
                              347-270-1863
                              Donald@drdunnlaw.com